## ATLANTIC COAST LINE RY. CO. v. RAILROAD COMMISSION OF GEORGIA.

(District Court, N. D. Georgia. June 23, 1922.)

No. 189.

1. **Courts ⬅328(3)—Amount in controversy in suit to enjoin state commission's order for rate refund is amount of refund.**

In a suit to enjoin the enforcement of an order of a state railroad commission for refund of a portion of the rate collected on certain shipments, where the only prayer was to enjoin the refund ordered, and no injunction was sought against any action of the commission in any other transaction, the amount in controversy was only the amount of refund sought to be enjoined, not the amount of the collections by the carrier under the same rate for other shipments.

2. **Courts ⬅328(3)—Penalties which might be imposed for violation of rate order are not part of amount in controversy.**

In a suit to restrain the enforcement of an order by a state railroad commission for a refund to a shipper, the amount of maximum penalties which might be imposed upon the carrier for violation of the order, though

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

it may give a right to enjoin the enforcement of the order, because the remedy at law would be inadequate, is not part of the amount in controversy, since no one could predict the amount of penalties which would be imposed for disobedience, or whether any would be actually attempted to be enforced.

3. **Courts ⬨326—Federal control acts are laws` regulating commerce, within jurisdictional provision.**

While Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j) giving the right to initiate freight rates during federal control by filing them with the Interstate Commerce Commission, and Transportation Act, § 208a, continuing the rates which existed under federal control during the six-months period of government guaranty, were based as much on the war power as on the power of Congress to regulate interstate commerce, those provisions are laws regulating commerce, within Judicial Code, § 24, subsec. 8 (Comp. St. § 991, subsec. 8), giving jurisdiction to the United States District Court over cases involving such laws without reference to the amount involved. ·

4. **Commerce ⬨34—Contract with carrier determines interstate character of commerce with respect to rates.**

While in the business of buying and selling goods interstate commerce may extend from the first purchase to final delivery, interstate transportation, for the purpose of determining the rate to be charged, should be governed by the contract with the carrier, so that a shipment originating in a foreign country or another state, but transported within the state under a separate billing contract, entitled the carrier to charge the intrastate rate for such transportation.

5. **Railroads ⬨5½, New, vol. 6A Key-No. Series—Rate filed with commission by Director General's agents is the binding rate.**

General Order No. 28 of the Director General, requiring his agents to file with the Interstate Commerce Commission any tariffs increasing the rates 25 per cent., which was based on the authority of Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), to initiate rates, did not itself effect the change, but the rates thereafter filed with the Commission by the agents, as directed by that order, which under Comp. St. § 8569, subd. 1, and section 5884, subd. 12, were the only legal rates, established the rate on a particular shipment, even though thereby it was increased more than the 25 per cent. authorized by the Director General.

6. **Railroads ⬨5½, New, vol. 6A Key-No. Series—Rate fixed by Director General on last day of control governs during guaranty period.**

A rate fixed by the Director General of Railroads on the last day of federal control was as much within his power as rates theretofore fixed, and was continued in force during the period of guaranty by Transportation Act, § 208a.

In Equity. Suit by the Atlantic Coast Line Railway Company against the Railroad Commission of Georgia to restrain enforcement of an order for refund of a portion of the race collected by the carrier. Decree granting the injunction entered.

Alston, Alston, Foster & Moise, of Atlanta, Ga., for petitioner.
Judge J. E. Ragan, of Atlanta, Ga., and J. Prince Webster, of Atlanta, Ga., for Railroad Commission.

SIBLEY, District Judge. The Railroad Commission of Georgia, by sections 2630 and 2631 of the Code of Georgia of 1910, has power to make intrastate railroad rates, by section 2633 has power to investigate violations of its regulations, by section 2664 may fix penalties for fail-

ure to adjust freight charges, and by section 2667 the railroads are required to comply with the orders and requirements of the commission, under heavy maximum penalties to be recovered by suit in court. Under these provisions of law the commission has investigated alleged overcharges on two carloads of fertilizer material shipped between March 1, 1920, and September 1, 1920, over the Atlantic Coast Line Railroad from Savannah, Ga., to Blackshear, Ga., has found that the rate of $1.80 per ton collected was an overcharge, the true rate being 80 cents, and has ordered a refund of the difference, amounting to about $75. The railroad company files its bill against the commission, praying an injunction against the enforcement of this order, as violative of acts of Congress under which it is claimed that the original charge was fixed and authorized, and because due process of law was not afforded in the hearing before the commission.

[1] 1. Jurisdiction is challenged by a motion to dismiss on the ground that less than $3,000 is involved. The counter contention made by amendment of the bill is that other shipments of such material were made during the guaranty period, the refunds on which, if enforced, would amount to more than $3,000, and that the penalties for disobedience of this order would greatly exceed $3,000. I am convinced, however, that only $75 is involved here. The prayers affect, and the bill consequently brings in controversy, only the order sought to be enjoined. If every prayer were fully granted, the only thing adjudicated would be the nonduty to repay this particular sum. No injunction is sought against any action of the commission in any other transaction. This case could affect other controversies only as an authority or precedent, whose application would depend on the similarity of the facts involved.

[2] So the penalties which might be imposed by a court—not the commission—for disobedience are not in controversy here. No one could predict the amount of them, or whether any would actually be attempted to be enforced. They can be avoided by paying the $75, and no more than that is in controversy now. The imposition of such heavy penalties has often been held to make the remedy at law unsafe and inadequate, and to afford ground for equitable jurisdiction (Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. [N. S.] 932, 14 Ann. Cas. 764), but I do not think they aid the federal jurisdiction as to the amount actually involved. See Western & A. R. R. v. Railroad Commission of Ga. (D. C.) 275 Fed. 128.

[3] However the right to collect the rate charged is placed on the provisions of section 10 of the Federal Control Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), giving the President the right to initiate freight rates by filing them with the Interstate Commerce Commission, and on the provision of section 208a of the Transportation Act (41 Stat. 464), continuing the rates which existed under federal control during the six months period of government guaranty, within which this controversy arose. The application of these laws determines the controversy one way or the other. While the war power, as much as the power of Congress to regulate interstate commerce, is behind these provisions, I think they are "laws regulating

commerce," within the meaning of Judicial Code, § 24, subsec. 8, (Comp. St. § 991, subsec. 8), giving jurisdiction to this court without reference to the amount involved, and of course they are "laws of the United States" within the constitutional limitations of jurisdiction.

[4] 2. No question is made of the power of the Georgia commission to enforce, as intrastate rates, those which were of force as such during the federal guaranty period. Its authority to do so will therefore not be examined. It is conceded that the rate charged, $1.80, is correct, if the transportation was part of an interstate movement, for that rate would be applicable in such transportation. The car, however, which carried the goods taken from the foreign ship, could not have moved in interstate commerce. I am inclined to think that the other, which came from Norfolk, Va., to Savannah, consigned to a definite person in Savannah, and there held on demurrage for failure to unload until a number of days passed, by which time it had been sold to some one else, and was then reconsigned to Blackshear, with switching charges, as for a local shipment, was not then in interstate commerce. While in the business of buying and selling goods, interstate commerce may reach all the way from first purchase to final delivery, interstate transportation for the purposes of determining the rate to be charged may have narrower limits. The contract with the carrier ought to determine the rates he may apply. If that contract, or the law or applicable commission rules, do not provide for an extension of the transportation by rebilling after arrival, the carrier is entitled to make delivery and settle his charges at the agreed destination, and if he is asked to carry further may demand a new and separate contract for the carriage. Nothing has been brought to my attention taking this case from the evident justice of this rule.

[5] But I am convinced that the result will be the same, whether the transportation be regarded as interstate or intrastate, for I think the intrastate rate of force must be held to be also $1.80 per ton. Both cars seem to have contained what is described as "imported" material; that is, material brought into the United States from abroad, for sale to domestic consumers. A special intrastate rate of 60 cents per ton was fixed as to such imported fertilizer materials prior to 1918. This admittedly was raised to 80 cents by the horizontal raise of 25 per cent. made by the Director General pursuant to General Order 28, effective June 25, 1918. This order recited the power given by section 10 of the Federal Control Act to initiate rates by filing them with the Interstate Commerce Commission. It directed that the intrastate rates be increased 25 per cent., and as so increased that they be filed with the Interstate Commerce Commission.

As I understand it, in carrying out this order, the rate committee of the Director General filed schedules which actually contained a rate of $1.80, instead of one of 80 cents, and it is said this change was in excess of the authority given in General Order 28. It is not contended to have been a clerical error, for it is shown that this rate had actually been in operation, through some confusion of tariffs, although the records of the Georgia commission showed the legal rate to be that first above mentioned. Now, it is to be observed that the rates were not

made by General Order 28, but by filing them with the Commission. The order was an authority or direction by the Director General to his officials. The filing alone made the proposed changes effective. The public are supposed to take note of and be bound by what is of file with the Commission, and are not immediately concerned with directions given by the Director General to his rate committee. Questions as to them ought to be dealt with between the Director General and his committee. The federal Commission is prohibited from suspending such rates before a hearing, but no doubt it has a responsibility in accepting them for filing to see that they come from a proper source.

It seems inappropriate for a state commission to enter upon an investigation of the propriety of the act of filing, which has not been questioned before the federal Commission nor repudiated by the Director General. The public, under prior law, have been required to look only to what is of file. The rates were required to be filed with the Commission and copies posted for public inspection. Compiled Statutes, § 8569, subd. 1. No rate could be charged or collected, except that so filed. Compiled Statutes, § 8569, subd. 7. Copies of the tariffs filed with the Commission are made evidence. Comp. Stat. § 8584 (12). The public and carriers were absolutely bound by the rate so established. No reason appears why the policy of these laws should not be applied to the rates fixed under emergency powers by the Director General.

[6] Yet again, this particular rate was specifically dealt with on the last day of federal control by a special filing, effective then, which canceled the import rate, whatever it might have been, and applied a rate of $1.80. The result evidently aimed at was to have uniformity of rate on the same commodity, regardless of its origin. Though this occurred on the last day of federal control, it was as much within the Director General's power as on any other date. The Transportation Act adopted the existing rates for the ensuing guaranty period. It seems to me that, with the power of Congress to make the adoption of both interstate and intrastate rates unchallenged, and the power of the Director General through his agents to make any rate he thought proper prior to March 1st admitted, and the actual filing with the Commission and its acceptance of the filing as authoritative conceded, that though the state commission may have the duty and authority to enforce the observance of these rates by the carriers, they may not go behind the filing to ascertain their authenticity.

Without passing upon whether due process of law was afforded in the hearing, the order here attempted to be enforced ought to be enjoined. A decree will be so entered.