### LANCASTER et al. v. SMITH et ux.
### (No. 502–3919.)

(Commission of Appeals of Texas, Section A. May 14, 1924.)

Railroads ⟺5½, New, vol. 6A Key-No. Series—Statute forbidding limitation of common-law liability, suspended during federal control, became automatically effective at termination thereof.

Rev. St. art. 708, forbidding common carriers to limit their common-law liability, which was suspended during federal control of railroads, automatically became effective on termination thereof; it not being intention of Transportation Act, Feb. 28. 1920, § 208(a) (U. S. Comp. St. Ann Supp. 1923, § 10071¼d), to require re-enactment.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Action by H. L. Smith and wife against J. L. Lancaster and others, receivers. Judgment for plaintiffs was affirmed by the Court of Civil Appeals (244 S. W. 1076), and defendants bring error. Affirmed.

R. E. Huff and J. T. Montgomery, both of Wichita Falls. for plaintiffs in error.

P. B. Cox and Chas. W. Keirsey, both of Wichita Falls, for defendants in error.

GERMAN, P. J. The judgment in this case was in favor of defendants in error for the sum of $2,300, the value of a trunk and contents. The shipment was from Fort Worth, Tex., to El Paso, Tex., under a ticket purchased February 18, 1921, over the Texas & Pacific Railway. This is one of the railroads that was under federal control during the period of federal administration. During the period of federal control the Director General of Railroads promulgated certain rates, rules, and regulations, including rule 10 of the Western Passenger Bureau Baggage tariff No. 25–2. Under and by authority of this rule liability for the loss of the trunk and contents here in question was limited to $120; it being found that no excess value was declared and no additional charges for excess value paid. We have held in the case of Pearl McConnell v. John Barton Payne, Agent, 262 S. W. 72, which has been under consideration with this case, that during the period of federal control the rates, rules, and regulations of the United States Railroad Administration superseded all other rates and regulations as to intrastate shipments as well as to interstate, and that article 708 of our Revised Statutes, which provides that no common carrier shall limit or restrict its liability as at common law, was suspended for the time being by the paramount authority of the federal regulations. Federal control of the railroads ended February 29, 1920. We are called upon in this case to determine the effect of section 208 (a) of the Transportation Act of 1920 (U. S. Comp. St. Ann. Supp. 1923, § 10071¼d), and answer whether or not in view of that act, the provisions of article 708 of our statutes remained suspended after the termination of federal control, and were so suspended at the time of the transaction in question, to wit, February 18, 1921.

The section of the Transportation Act referred to is as follows:

"All rates, fares, and charges, and all classifications, regulations, and practices, in anywise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by state or federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission."

It goes without question that without the foregoing enactment by Congress, or a similar one, all state laws and regulations which had been suspended by federal control would have automatically taken effect at the end of the suspension; that is, at the termination of the federal control. Tua v. Carriere, 117 U. S. 201, 6 Sup. Ct. 565, 29 L. Ed. 855. The intention of Congress that such automatic reversion should not occur, as to rates and charges not fixed by statute, is manifest. It has been held by very eminent authorities that Congress had the constitutional power to enact this statute, making it applicable

---

⟺For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to intrastate matters, and the reasoning upon which such holding is based is plausible. Michigan Cent. R. Co. v. Michigan P. U. Com. (D. C.) 271 Fed. 319; Wasatch Coal Co. v. Baldwin et al., 60 Utah, 397, 208 Pac. 1109; Public Service Comm. v. N. Y. Cent. R. R. Co., 230 N. Y. 149, 129 N. E. 455, 14 A. L. R. 449.

The foregoing were each and all rate cases. We think it is apparent from the working of the statute itself that it was not the intention of Congress to require a state statute requiring a positive duty or affixing an affirmative limitation upon common carriers, to be re-enacted by the state Legislature before same would be effective as to intrastate matters. In the case of Public Service Commission v. New York Cent. R. Co., supra, the court say:

"Obviously the purpose of this clause so far as the states were concerned was to maintain fares until September 1st and thereafter until, in view of possible new conditions, affirmative action was taken by the state authorities. The thought was that in many instances local rates had been fixed by local commissions with a view to costs and earnings as they existed prior to 1917. Let them act if they desired to restore the old rates. It is equally obvious that when such action was taken is immaterial if the actual reduction did not take effect until September 1st. In a case like that of the defendant where the rate is a condition of the charter, or in a case where the rate is fixed by statute, there would seem to be less purpose in such a provision. Possibly it seemed wise in all cases to give the roads formal warning of reversion to the old state of affairs and an opportunity to make and file the necessary tariff schedules. In any event, Congress made no exception to the general rule."

It seems to us clear that from the provisions of the law itself it was those rates, fares, and charges which are fixed by state or federal commission, created for that purpose, after due notice and hearing, which it was intended were to continue unchanged until affirmative action was taken by "state or federal authority." As pointed out by the New York court there were good reasons why this should be done. But in case of a statute, like article 708, which is not primarily concerned with rates, fares, or charges, and which in no sense rests upon a policy growing out of new and changed conditions, there is no occasion whatever of notice or a hearing, and we think it automatically became effective on the termination of federal control, and that Congress so intended. Congress well knew that there were many state statutes imposing affirmative duties, and affecting liability, which had no relation to the new conditions, and which did not require the action of any commission to revive, and in the language of the act itself recognized and provided that same would and should be revived "pursuant to authority of law."

We therefore think that after the termination of federal control, and particularly after September 1, 1920, article 708 of our statutes, providing that common carriers cannot limit their common-law liability, had complete and exclusive application to the transaction involved here.

A like holding has recently been made by the Court of Civil Appeals at San Antonio in the case of T. & P. Ry Co. v Graham, 257 S. W. 642, in which writ of error was dismissed for want of jurisdiction, and we think this supports our conclusion.

We have given careful consideration to the other assignments by plaintiffs in error and think they have been correctly decided by the Court of Civil Appeals.

We therefore recommend that the judgment of the Court of Civil Appeals and of the district court be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.