## MISSOURI PACIFIC RAILROAD COMPANY *v.* BOONE.

### CERTIORARI TO THE ST. LOUIS COURT OF APPEALS OF THE STATE OF MISSOURI.

No. 203. Argued January 29, 1926.—Decided March 22, 1926.

1. A construction of a statute which makes its constitutionality doubtful is to be avoided if possible. P. 471.

2. Section 208(a) of the Transportation Act, 1920, provided (1) that all rates, fares and charges, and all classifications, regulations and practices, in any wise changing, affecting, or determining any part or the aggregate of rates, fares or charges, or the value of the service rendered, which, on February 29, 1920, were in effect on lines of carriers subject to the Interstate Commerce Act, should continue in force until " thereafter " changed by state or federal authority, or pursuant to authority of law; (2) that, prior to September 1, 1920, no such rate, fare or charge should be reduced, and no regulation, etc., should be changed in such manner as to reduce any such rate, etc., unless such reduction or change were approved by the Interstate Commerce Commission. *Held:*

(1) That a provision in a baggage tariff filed by the Director General of Railroads during federal control, limiting liability for misdelivery of baggage, is within the purview of this section. P. 468.

(2) The primary purpose of the second clause was, by safeguarding rates, to protect the United States from liability on its six months' guaranty of a " standard return " to carriers when released from federal control. P. 472.

(3) The purpose of the first clause was to remove doubts as to what tariffs were to be applicable after termination of federal control, by declaring that the existing tariffs, largely initiated by the Director General, should be deemed operative except in so far as changed after February 29, 1920, pursuant to law. Pp. 472, 475.

(4) Where a tariff of the Director General limiting liability for misdelivery of baggage had suspended the operation of a state statute making the carrier liable for the full value, the effect of the first clause of § 208(a) was that the statute became again applicable, without re-enactment, after February 29, 1920; so that the damages recoverable by an intrastate passenger for the loss

of a trunk after September 1, 1920, were governed by the state statute.   P. 476.

263 S. W. (Mo.) 495, affirmed.

CERTIORARI to a judgment of the St. Louis Court of Appeals, affirming a judgment against the railroad for the full value of baggage which it failed to deliver to Boone, an intrastate passenger.

*Mr. Merritt U. Hayden,* with whom *Messrs. Edward J. White* and *James F. Green* were on the brief, for petitioner.

*Mr. Frederick L. English,* with whom *Mr. Morton Jourdan* was on the brief, for respondent.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

In 1922, Byrd J. Boone, a passenger on an intrastate journey in Missouri over the Missouri Pacific Railroad, checked a trunk which she took with her. It arrived safely at its destination but was not delivered to her because a thief obtained possession through the device of changing checks. She brought this suit against the carrier in a court of the State; and claimed that, under § 9941 of the Revised Statutes of Missouri, 1919, she was entitled to the full value. This law, first enacted in 1855, Mo. Rev. Stat., c. 39, § 45, had never been suspended or repealed by any law of the State. The defendant relied upon a baggage tariff which limited liability to $100 unless a greater value was declared and extra payment made. This tariff, applicable to both intrastate and interstate traffic, had been duly filed by the Director General of Railroads pursuant to the Federal Control Act, March 21, 1918, c. 25, § 10, 40 Stat. 451, 456, and was in force on the termination of federal control, February 29, 1920. The defendant contended that, by virtue of

§ 208(a) of Transportation Act, 1920, February 28, 1920, c. 91, 41 Stat. 456, 464, this limitation had remained in force as applied to intrastate commerce, because the provision for unlimited liability contained in § 9941 of the Missouri Revised Statutes had not been re-enacted after the termination of federal control.

Section 208(a) provides:

"All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission."

The trial court entered judgment for $1,000 and interest. The judgment was affirmed by the St. Louis Court of Appeals, the highest court of the State in which a decision in the suit could be had. 263 S. W. 495. The court held that, under the law of Missouri, misdelivery of the trunk was a conversion which rendered the carrier liable for its full value; and that the state law governed because the journey was intrastate. This Court granted a writ of certiorari. 266 U. S. 600. Under the federal law misdelivery is not deemed a conversion depriving a carrier of the benefit of the provision limiting liability. *American Railway Express Co. v. Levee,* 263 U. S. 19, 21. The sole question for decision is the construction and effect to be given § 208(a).

The provision in the baggage tariff limiting liability is within the purview of that section. There was no

legislation by the State on the subject after the termination of federal control. The State had confessedly power to restore the full statutory liability as applied to intrastate commerce unless the Interstate Commerce Commission should, for the purpose of preventing discrimination against interstate commerce, issue an order under Transportation Act, 1920, to the contrary. See *Wisconsin Railroad Commission* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563; *New York* v. *United States,* 257 U. S. 591. There was no such order. Compare *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Public Utilities Commission,* 242 U. S. 333. The precise question is whether the state provision, which had been suspended by the filing of the tariffs of the Director General, became operative on September 1, 1920, without re-enactment, or whether affirmative action by the State after February 29, 1920, was necessary to restore the full liability theretofore created by its statute and which it had not repealed. The analogy of state insolvent laws suspended by enactment of a bankruptcy act and again becoming operative upon its repeal, was relied upon. See *Tua* v. *Carriere,* 117 U. S. 201; *Butler* v. *Goreley,* 146 U. S. 303.

Most of the rates, fares and charges in effect on February 29, 1920, had been established without suspending any provision of any statute or the order of any regulatory body. They related to matters with which, both before and after federal control, carriers were, in the main, at liberty to deal in their discretion, without first securing the consent of either the federal or the state commission. For despite the enlarging sphere of regulation, the field in which the carrier may exercise initiative and discretion was and is still a wide one.[1] The existing right of the

---

[1] Even under Transportation Act, 1920, the power inheres in the carriers, to initiate increases or decreases of rates, fares and charges, subject, of course, to the control of the appropriate regulatory body. Increases or decreases of interstate rates may, without action by the Interstate Commerce Commission, become operative after 30

carriers to initiate rates was transferred by· the second
paragraph of § 10 of the Federal Control Act to the Di-
rector General, with three modifications.[2]   The Inter-
state Commerce Commission for the time was made the
regulatory body in respect to intrastate as well as inter-
state rates.   The power of suspending tariffs involving
increases (which had been first conferred upon the Com-
mission by Act of June 18, 1910, c. 309, § 12, 36 Stat.
539, 552) was denied to it in respect to such as were filed
by the Director General.   And the power to fix the date
when the new tariffs should take effect was vested in the
Director General, instead of being fixed (as provided by
§ 6 of the Interstate Commerce Act) at not less than
30 days subject to the discretion of the Commission.   It
was by virtue of the ordinary corporate power of carriers
to establish rates, so transferred to the Director General,
that the rates, fares, charges, classifications, regulations
and practices referred to in the first clause of § 208(a)
had, in the main, been established.[3]

---

days' notice by the simple act of filing, unless the Commission suspends them.   See Interstate Commerce Act, § 6 (3) and § 15 (7).
The power of the carrier to initiate intrastate rates, fares and charges,
is even broader in many States.   See William E. McCurdy, " The
Power of a Public Utility to Fix its Rates and Charges in the Absence
of Regulatory Legislation."   38 Harv. Law Rev. 202.

[2] Compare *Willamette Valley Lumbermen's Asso.* v. *Southern Pacific
Co.*, 51 I. C. C. 250; *Johnston* v. *Atchison, Topeka & Santa Fe Ry.
Co.*, 51 I. C. C. 356, 361; *California Canneries Co.* v. *Southern Pacific·
Co.*, 51 I. C. C. 738, 764–772; *Natches Chamber of Commerce* v. ·
*Louisiana & Arkansas Ry. Co.*, 52 I. C. C. 105, 130; *Public Service
Commission of Washington* v. *Alabama & Vicksburg Ry. Co.*, 53
I. C. C. 1; *Illinois Coal Traffic Bureau* v. *Director General*, 56 I. C. C.
426, 431; *Utilities Development Corporation* v. *Pittsburg, Cincinnati,
Chicago & St. Louis Ry. Co. et al.*, 56 I. C. C. 694; *American
Wholesale Lumber Asso.* v. *Director General*, 66 I. C. C. 393, 396;
*Alabama Co.* v. *Director General*, 78 I. C. C. 561.

[3] See General Order No. 28, issued May 25, 1918, U. S. Railroad
Administration Bulletin No. 4 (Revised), p. 285; Reduced tariff
rates on building materials, April 11, 1919, Supplement to Bulletin,

In support of the judgment below, it is contended that the section would be unconstitutional, if construed as providing that the Missouri statute, although applicable only to intrastate commerce, should not become operative unless and until re-enacted. The argument is this: If so construed, the Act of Congress would, in effect, repeal all such state laws affecting intrastate commerce existing at the termination of federal control, while granting to the States permission to legislate on the subject thereafter or recognizing their power to do so. The prohibition of reductions of intrastate rates during the six months' period of guaranteed return, was a proper exercise of power incident to federal operation and control during the war. Congress could, under that power, also make reasonable provision to ensure workable tariffs on the restoration of the railroads to their owners. But a repeal by Congress of all such existing state laws, affecting intrastate commerce, coupled with permission to enact new ones, would not be an appropriate means to that end, nor could such legislation be sustained under the commerce clause. Regulation by a State of intrastate rates is not a function exercised by permission of the Federal Government, *In re Rahrer,* 140 U. S. 545, 564, or because of its inaction. The power of Congress over intrastate rates conferred by the commerce clause is limited to action reasonably necessary for the protection of interstate commerce, *Wisconsin Railroad Commission* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563. No necessity is here shown. Such is the argument. The section, if so construed, would, at least, raise a grave and doubtful

p. 25. "The rates were made by filing the tariffs with the commission. The orders were directions of the Director General to his officials." Compare *Atlantic Coast Line Ry. Co.* v. *Railroad Commission of Georgia,* 281 Fed. 321, 325; *Anaconda Copper Mining Co.* v. *Director General,* 57 I. C. C. 723, 726; *Lehigh Valley Coal Co.* v. *Director General,* 69 I. C. C. 535, 539.

constitutional question. Under the settled practice, a construction which does so will not be adopted, where some other is open to us. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408; *Federal Trade Commission* v. *American Tobacco Co.*, 264 U. S. 298, 307. An examination of the section in the light of the then existing federal and state law will make clear that another and reasonable construction is open to us, and that it should prevail.

Section 208(a) contains two clauses. Each was to take effect immediately. Each dealt with rates, fares, charges, classifications, regulations and practices. But in purpose, character, and scope the two clauses differ widely. The primary purpose of the second clause was to protect the United States from liability on its guaranty to the carriers of the standard return. It sought to do so by prohibiting any reduction of rates, fares or charges without the consent of the Interstate Commerce Commission. The prohibition applied alike to intrastate and to interstate rates. It extended to reductions made by the carriers, as well as to those made by the States. But the prohibition was limited to reductions. Increases might be made. The prohibition was confined to the first six months after the surrender of the railroads to their owners, because the Government guaranty was limited to that period.

The first clause of § 208(a) is legislation permanent in character. It relates alike to changes which increase rates and to those which reduce. It contains no prohibition. It explains. Its purpose was not to conserve revenues but to remove doubts and avoid confusion. A clarifying provision was needed. Comprehensive changes in the rates, fares, charges, classifications, regulations and practices had been made by the Director General by filing the same with the Interstate Commerce Commission, pursuant to power conferred by § 10 of the Federal Control

Act.   It was important that carriers and the public should know whether, and to what extent, these changed rates, fares, charges, classifications, regulations and practices would continue in force after the return of the railroads to their owners.   This information the first clause supplied by specifying what tariffs were applicable.   To facilitate the conduct of business by this means was an appropriate exercise of the power of Congress.   To have undertaken to do so by means of abrogating all rates, fares and charges established by the several States in respect to intrastate commerce, and all classifications and regulations affecting them, would not have been.   It is not lightly to be assumed that Congress would have resorted to means so extraordinary for securing workable tariffs.

It is suggested that, although the primary purpose of the first clause of § 208(a) was to facilitate the conduct of business, Congress intended thereby also to protect the carrier's revenues; and that a requirement of an affirmative exercise of state power after termination of federal control would, by presenting an obstacle to change, make reductions of rates by the States difficult, and thus result in protecting the carrier's revenues.   That Congress did not devise the first clause as a means of so protecting revenues appears from the character of the provision there made.   The clause applies equally, whether the rate made by the Director General was a reduction or an increase of the rate in effect before federal control.   The clause left the several States free to proceed at once to establish reductions, and to make them effective upon the expiration of the Government's guaranty.   Whether a particular State could avail itself of that liberty would thus depend wholly upon its own constitution, legislation and practice. If at the time Transportation Act, 1920, was enacted the legislature either happened to be in session or could be promptly convened, the State might by a single statute

have restored, as of September 1, 1920, its rates, fares and charges and all classifications, regulations and practices affecting them, no matter what change the Director General had made. In those States where the rate-making power was vested in a regulatory body in continuous session a like result could have been attained through a single order. On the other hand, in those States where the local law did not permit such prompt action by the rate-making authority, the restoration of rates by state action would necessarily have been deferred. It is not to be assumed that Congress intended to adopt a means of protection which would have been indirect, fortuitous and largely futile, and which would obviously have produced such inequalities among the States, when direct, certain and better means of protection were available.

Moreover, there was no purpose in Congress to maintain in force, after the expiration of the six months' guaranty period, either the interstate or the intrastate rates which had been established by the Director General. It was recognized, when Transportation Act, 1920, was enacted, that these were not high enough to yield to the carriers adequate revenues. Means of increasing them were specifically provided by those sections of Transportation Act, 1920, which prescribe the essentials of a fair return and empower the Commission, upon notice to the States and with their cooperation, to prevent discrimination against interstate commerce resulting from unduly low intrastate rates, fares and charges. See §§ 415, 416 and 422. Proceedings were in contemplation by means of which it was proposed to establish largely increased rates on the expiration of the Government's guaranty, September 1, 1920. The order for such general increase made by *Ex parte 74, Increased Rates, 1920,* 58 I. C. C. 220, on July 29, 1920, followed extensive hearings in which commissions representing the States participated.

Proceedings were instituted in the States before September 1, 1920, to secure corresponding increases of the intrastate rates. And further proceedings were had before the federal Commission to remove obstacles to increases of the intrastate rates which existed in some of the States.[4] The six months' prohibition of reductions provided for by the second clause of § 208(a) afforded carriers and the Interstate Commerce Commission ample opportunity to take such action as might be deemed advisable for carrying out the new policy established by Transportation Act, 1920.

When the first clause of § 208(a) is examined in the light of these facts, the construction to be given it becomes clear. In order to remove doubts as to what tariffs were to be applicable after the termination of federal control, Congress declared that the existing tariffs, largely initiated by the Director General, should be deemed operative, except so far as changed thereafter—that is, after February 29, 1920—pursuant to law. Such modification of intrastate tariffs might result from action of the carriers taken on their own initiative. It might result from orders of the Interstate Commerce Commission. It might result from the making either of new state laws or of new orders of a state commission acting under old laws still in force and again becoming operative. Or such modification might result from the mere cessation of the suspension, which had been effected through federal control, of statutes or orders theretofore in force and still unaffected by any

---

[4] See Annual Report of the Interstate Commerce Commission, December 1, 1920, pp. 6-10; *Rates, Fares and Charges of New York Central R. R. Co.,* 59 I. C. C. 290; *Intrastate Rates Within Illinois,* 59 I. C. C. 350; *Wisconsin Passenger Fares,* 59 I. C. C. 391; *Wisconsin Railroad Commission* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563; *New York* v. *United States,* 257 U. S. 591; *Re Steam Railroads,* P. U. R. 1920F 7; *Re Northern Pac. Ry. Co.,* P. U. R. 1920F 11; *Re Railroads,* P. U. R. 1920F 17; *Re Railroads,* P. U. R. 1920F 33; *Re Freight Rates of Carriers,* P. U. R. 1921A 399.

action of the authority which made them. In any of these cases, the change would be effected "thereafter;"— that is, after the termination of federal control. The statute of Missouri enforced by its courts was in effect in 1922. The judgment is

*Affirmed.*