## LUTCHER & MOORE LUMBER CO. v. BEAUMONT, S. L. & W. RY. CO.* et al.

### No. 9468.

Court of Civil Appeals of Texas. Galveston. Oct. 14, 1930.

Rehearing Denied Nov. 13, 1930.

Fulbright, Crooker & Freeman, Carl G. Stearns, and James J. Shaw, all of Houston, for appellant.

Andrews Streetman, Logue & Mobley, W. M. Streetman, and Robert H. Kelley, all of Houston, for appellees.

GRAVES, J.

This statement, interlined as to only two details about which there is no dispute, has been taken from appellant's brief, with the concession by the appellees that it is substantially correct:

"The plaintiff, Lutcher & Moore Lumber Company, sued the defendants, Beaumont, Sour Lake & Western Railway Company, and Orange & Northwestern Railway Company, to recover $1,744.77, alleged to have been charged by defendants in excess of the rates established by the Railroad Commission of Texas for the transportation of lumber in carloads over defendants' lines of railroad from Orange, Texas, to Houston, Texas, during the period from October 1, 1920, to April 28, 1922, its theory being that a rate of 10 cents per 100 pounds was both the rate fixed by the Texas Railroad Commission and the lawful, proper, and applicable one.

"The defendants answered, pleading: (a) General demurrer and (b) general denial; and specially answering, defendants, in substance, alleged that the rates charged by them were in effect not only by authority of the laws of the United States, but also as to the 14½ cent rate charged by an express order of the Railroad Commission of Texas.

"The case was tried to the court without a jury. Upon judgment being rendered in favor of defendants, plaintiff excepted and gave notice of appeal.

"By stipulation of the parties, the question for the determination of the trial court was reduced to the following:

"Whether the lawful rate applicable to the shipments involved in the case was 10¢ per 100 lbs., as claimed by plaintiff; or 14½¢ per 100 lbs. on all shipments which moved

---

*Writ of error granted.

prior to March 5, 1921, and 15¢ per 100 lbs. on all shipments which moved subsequent thereto, as claimed by the defendants. If the basis claimed by the plaintiff was the correct one, judgment should have been rendered in favor of the plaintiff for $1,744.77, together with interest at 6% from the date each payment was made. If the basis claimed by the defendant was the correct one, then the court correctly entered judgment for the defendants.

"The questions, then, before this court are simply whether the trial court erred in holding that the lawful rate for the transportation of lumber in carloads over defendants' (appellees') lines from Orange to Houston during the period from October 1, 1920, to April 28, 1922, was 14½c on shipments which moved prior to March 5, 1921, and 15c per 100 lbs. on shipments which moved subsequent thereto; and whether the court erred in refusing to hold that the lawful rate for such transportation during the entire period from October 1, 1920, to April 28, 1922, was 10c per 100 lbs."

In this court, through a number of presentments, appellant in substance contends that the undisputed evidence shows, not only that the rates charged and collected from it by the appellees in the transactions here involved (that is, 14½ cents per 100 pounds on all shipments that moved prior to March 5, 1921, and 15 cents per 100 pounds on all that moved subsequent thereto) were in excess of the rates in fact established by the authority of the state of Texas for the transportation of such property over the appellees' lines in intrastate commerce, but also that such lower state rates were never set aside, annulled, or otherwise rendered ineffective, by any order, rule, or law, made or enacted either by the state or the federal government; that prior to December 28 of 1917, the Railroad Commission of Texas by its special authority No. 37 established a special commodity rate of 6 cents per 100 pounds for the transportation of lumber in carloads over appellees' lines between Orange and Galveston, and adopted its order No. 5198 whereby appellees were required to observe "all commodity rates currently in effect between Galveston, Texas, and Orange, Texas," as "maxima on shipments of the same commodity transported between Houston, Texas, and Orange, Texas"; that on December 28, 1917, pursuant to the Federal Possession and Control Act (39 Stat. 645 [10 USCA § 1361]), the President of the United States through the Director General of Railroads assumed control of the appellees' lines, along with all other railways within the continental United States, and on the next day, conformably to the proclamation so doing, issued General Order No. 1, which, among other things, provided: "7. Existing schedules or rates * * * are to be observed," thus adopting and continuing in effect the 6-cent rate from Orange to Houston, so previously fixed by the Railroad Commission of Texas; that on May 25 of 1918 the Director General, by his General Order No. 28, directed a general increase in all intra and inter-state rates, effective June 25 of that year, thereby increasing the lumber rates 25 per cent., and raising this 6-cent rate thereon from Orange to Houston to 7½ cents, which thereafter, up until December 31 of 1919, remained the maximum rate to be charged on carload lots of lumber between those two points; that on December 31, 1919, the Director General published a tariff, "Texas Lines Tariff No. 36, A. C. Fonda's I. C. C. No. 73," containing rates on lumber and setting forth a general mileage scale thereof for its transportation between points on the appellees' lines, which, for the "over 55 miles" distance from Orange to Houston, named a rate of 11 cents per 100 pounds, this being the same as the rate named in the general mileage scale of rates prescribed by the Texas Railroad Commission as increased 25 per cent. by the Director General's order No. 28; that, while this tariff No. 36 published a special commodity rate of 7½ cents per 100 pounds on lumber in carloads from Orange to Galveston, and while the provision making this rate the maximum from Orange to Houston was not at any time specifically or expressly repealed or revoked by any order or action of the Interstate Commerce Commission, or the Director General of Railroads, although published in other tariffs of the Railroad Administration, including the general tariffs, it was omitted from this No. 36, or any other tariff specifically purporting to apply on lumber, wherefore the Texas Railroad Commission's order requiring the Orange to Galveston rate on lumber to be applied as the maximum from Orange to Houston was never repealed or revoked through any act of the Director General, but remained in full force and effect throughout federal control; that, if the contrary be assumed, however (that is, that this Texas Commissions' maximum-rate provision was repealed by implication, or put into a state of "innocuous desuetude," as a result of the Director General's tariff No. 36 on December 31 of 1919, leaving his general mileage-scale rate of 11 cents per 100 pounds the only one then extant on lumber between the two points involved, nevertheless it still uncontrovertedly appears that the 11-cent rate), if it became effective on December 19, 1919, continued so until the end of federal control on March 1, of 1920, whereupon, ex proprio vigore, the Texas Commission's original order prescribing the Orange-Galveston rate to be observed as the maximum one from Orange to Houston revived and again bound the appellees to the same extent it did before federal control, since it "was not repealed or amended by the Railroad Commission of Texas, or by any other authority of the State of Texas, from the date thereof until after all the shipments here involved had moved," wherefore such rate be-

came, as of that date, the rule of decision, Civil Statutes of 1914; Missouri-Kansas & T. Ry. v. R. R. Commission (Tex. Civ. App.) 3 S.W.(2d) 489; Producers', etc., v. Ry. (Tex. Com. App.) 13 S.W.(2d) 679; West Texas Compress Co. v. Ry. (Tex. Com. App.) 15 S.W.(2d) 558.

After then further urging that neither section 208(a) of the Transportation Act of 1920 (41 Stat. 464), nor any other act or order of the federal government, should be given the effect of superseding this maximum-rate order of the State Railroad Commission, citing in that connection Lancaster v. Smith (Tex. Com. App.) 262 S. W. 74, and Missouri Pac. Ry. v. Boone, 270 U. S. 466, 46 S. Ct. 341, 70 L. Ed. 688, appellant's brief thus concludes its argument for reversal of the judgment:

"We submit, under the foregoing authorities, that upon the termination of Federal control, the Railroad Commission's regulation or order requiring the defendants to observe the Orange to Galveston rate as maximum from Orange to Houston, which regulation or order was theretofore 'in force and still unaffected by any action of the authority which made' it, became revived and assumed full force and effect and was binding on the defendants by the 'mere cessation of the suspension which had been effected through Federal control'. In other words, that on the termination of Federal control the said order of the Railroad Commission of Texas was revived and thereby the 10c per 100 lb. rate again became applicable on shipments of lumber moving between Orange and Houston.

"The only question left is what rate was in effect on lumber in carloads from Orange to Galveston during the time these shipments moved. On August 21, 1920, when the Railroad Commission of Texas promulgated its circular No. 5326 and thereby authorized all railroads in Texas to increase 'all existing rates' 33⅓%, the existing rate on lumber, in carloads from Orange to Galveston, was 7½c per 100 lbs. Increasing the 7½c rate 33⅓% made the rate 10 cents per 100 lbs. And the 10-cent rate thus established was not affected by the Interstate Commerce Commission's order in Docket No. 11764 reported in 60 I. C. C. 421."

Appellant's contentions seem to this court to be so completely and satisfactorily answered by the able brief filed for the appellees that, conscious of our inability to improve upon it, we adopt this much of it as expressive of our own conclusions:

"The Director General, pursuant to the power vested in him by section 10 of the Federal Control Act published, effective December 31, 1919, Texas Lines Tariff No. 36, A. C. Fonda's I. C. C. No. 73, which contained a mileage scale of rates to apply to the intrastate transportation in Texas of lumber moving between points on the lines of appellees. This scale provided a rate of 11 cents per 100 pounds for distances in excess of fifty-five miles. Such tariff was the only tariff at the time published by the Director General of Railroads. which specifically purported to state rates on lumber between the points involved. The distance between Orange and Houston exceeds fifty-five miles.

■ "There can be no doubt of the paramount power of the Director General to initiate rates during the period of federal control. Mr. Chief Justice White, in Northern Pacific Railroad Co. v. North Dakota, 250 U. S. 135, 148, 39 S. Ct. 502, 63 L. Ed. 897, 903, referring to section 10 of the Federal Control Act (40 Stat. 456), said that this section 'in express terms confers the complete and undivided power to fix rates.' To the same effect see Payne v. McConnell (Tex. Civ. App.) 234 S. W. 942.

"Counsel for appellant suggest that some question exists as to whether this rate of 11 cents would have applied to the traffic in question if it had moved upon the effective date of the tariff just referred to. The only reason they could advance in support of this suggestion would be that the Texas Commission, prior to federal control, had issued its Circular No. 5198, fixing the Orange-Galveston rates as maxima on similar traffic between Orange and Houston, which circular had, up to that time, neither been repealed nor amended by the Texas Commission; and the fact that the Orange-Galveston rate of December 31, 1919, was 7½ cents.

"It appears, however, that although the Texas Commission's circular No. 5198 was published in other tariffs of the Director General, it was not published in any of his tariffs specifically applying to shipments of lumber and particularly was not published in this Texas Lines Tariff No. 36.

■■ "This situation presents for solution a problem so simple that reference to it as a problem accords it undue dignity. It calls for a simple application of the old and familiar rule that special provisions always control general provisions, whether in the construction of statutes, contracts, tariffs, or other written instruments. Here is a special tariff applying to lumber. It names a specific rate for the transportation of lumber over a specific route between specific points. The rate is 11 cents per 100 pounds. The suggestion of our adversaries is that this specific provision of a tariff specifically applying on lumber should be controlled and nullified by an unrepealed general circular of the Railroad Commission of Texas which, with respect to the transportation of lumber, had been definitely and unequivocally rejected by the Director General, who then exercised the rate-making power. Expressio unius, exclusio alterius. Having adopted that circular for the purpose of other tariffs, his failure to adopt it for the purpose of the lumber tariff is an em-

phatic affirmation of his intention to exclude it from consideration in determining the rates on lumber.

"On the other hand, appellant can prevail only by adopting one of the following alternatives: (a) To find the rate on lumber from Orange to Houston over the lines of these appellees, we must (1) disregard the mileage scale provided in the lumber tariff for specific application to such a movement; (2) select out of the lumber tariff a rate of 7½ cents per 100 pounds shown in that tariff to apply to movements from Orange to Galveston; (3) read into the lumber tariff of the Director General the provisions of Circular 5198 of the Railroad Commission of Texas, omitted from that tariff but published in certain other tariffs; and (4) treat the Orange-Galveston rate of 7½ cents, under the terms of that circular, as the maximum to be charged from Orange to Houston. Or, (b) it may be conceded, as appellant does in its brief, that the 11-cent rate was the lawful rate fixed by the lumber tariff of the Director General. It must then be assumed that immediately upon the termination of the guaranty period. (September 1, 1920) Circular 5198 became operative in its original vigor, and fastening itself upon the Orange-Galveston rate, automatically assumed control of the situation and made the Orange-Galveston rate of 10 cents the maximum to be charged from Orange to Houston. The vice in the first alternative is that, contrary to the familiar rule, it involves the control of a special provision by a general one. The vice in the second is that, contrary to facts, it overlooks entirely the effect of the Texas Commission's order of August 21, 1920.

"We start off, then, with a rate of 11c per 100 pounds which, indubitably, became effective on December 31, 1919. This rate continued in effect during the remainder of Federal Control and at the termination of Federal Control was still in effect.

■ "2. Federal Control terminated March 1, 1920, pursuant to the provisions of section 200 of Transportation Act 1920 (41 Stat. 457). Section 208 (a) of Transportation Act 1920 (41 Stat. 464), reads as follows:

"'All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part of the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge,

unless such reduction or change is approved by the Commission.'

"Tersely stated, this forbade any change in the rates existing at the end of the federal control except pursuant to lawful authority. and immediately followed that prohibition with another to the effect that during the six months ending August 31, 1920, no change which constituted a reduction in rates should become effective except by authority of the Interstate Commerce Commission. In other words, where the change in rates was to be a reduction, there was to be only one 'lawful authority'—the Interstate Commerce Commission. It is unnecessary to show that this was a proper exercise of the federal legislative power because of the provision for a six months' guaranty made by section 209 (41 Stat. 464 [49 USCA § 77]). In Missouri Pacific Railroad Co. v. Boone, 270 U. S. 466, 471, 46 S. Ct. 341, 70 L. Ed. 688, 692, the Supreme Court has said:

"'The prohibition of reduction of intrastate rates during the six months' period of guaranteed return was a proper exercise of power incident to federal operation and control during the war.'

■ "In consequence, by virtue of section 208 (a) of Transportation Act 1920, the 11-cent rate in effect at the end of federal control continued in effect, during the guaranty period, until changed as shown below.

"3. By Transportation Act 1920, there was added to the Interstate Commerce Act a new section, known as section 15a (49 USCA § 15a). By this the Interstate Commerce Commission 'in the exercise of its power to prescribe just and reasonable rates * * * shall initiate, modify, establish or adjust' rates so that the carriers as a whole or by groups might earn a fair return upon the aggregate value of their railway property devoted to the transportation service. Dayton-Goose Creek Railway Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; St. Louis & O'Fallon Railway Co. et al. v. United States, 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798.

"Responding to the mandate of Congress, the Interstate Commerce Commission, in Increased Rates, 1920, 58 I. C. C. 220, authorized certain increases, effective August 26, 1920, in the rates, fares, and charges then existing. The authorized increase in the district which included the state of Texas was 35 per cent. Effective on the same date (August 26, 1920, within the guaranty period) the Railroad Commission of Texas, by its Circular No. 5326, authorized an increase of 33⅓ per cent. in all existing rates, bringing the 11-cent rate up to 14½ cents.

"Thus, the Railroad Commission of Texas, by its own order, instead of insisting upon the vitality and effectiveness of Circular No. 5198, affirmatively raised the rate of 11 cents

per 100 pounds to 14½ cents per 100 pounds. In other words, so far as the validity of the 14½-cent rate is concerned, especially following the termination of the six months' guaranty period, the appellees do not rely upon the federal power unaided; but they rely upon the affirmative order of the Railroad Commission of Texas fixing a rate for intrastate traffic in Texas by applying a percentage to another rate then lawfully in force.

"Counsel for appellant say:

" 'In the following argument it is important to bear in mind that this regulation or order (Circular 5198) was not repealed or amended by the Railroad Commission of Texas, or by any other authority of the State of Texas, from the date thereof until after all the shipments here involved had moved.'

█ "They concede, in other words, that the continued vitality of Circular 5198, unaffected by any subsequent order of the Railroad Commission of Texas, is vital to their case. Unfortunately for appellant the fact is that the Texas Commission, by its Circular No. 5326, authorized a 33⅓ per cent. increase in 'the current rates and charges.' This order was dated August 21, 1920, within the guaranty period; and at that time the current rate on lumber applicable to traffic such as that involved in this case was 11 cents per 100 pounds. Therefore, the rate of 14½ cents was affirmatively established by order of the Texas Commission which, to that extent, repealed or suspended Circular No. 5198, by necessary implication.

"Counsel for appellant say again that:

" 'Since statutes enacted prior to Federal control revived and again became operative after termination of Federal control, the Railroad Commission's regulation or order likewise revived and became operative after Federal control.'

"So long as no conflict with the paramount federal power is involved that statement is correct. Here, however, the order of the Texas Commission (Circular 5198) did not take effect immediately upon the termination of federal control because that was forbidden by the express terms of section 208(a) of Transportation Act 1920. And the prohibition of that section has been declared by the Supreme Court to have been a proper exercise of federal power. Missouri Pacific Railroad Company v. Boone, supra. That situation continued until the Railroad Commission of Texas, by its own affirmative action, made the increase to 14½ cents. At this point the situation presented in this case is radically different from that which was involved in the case so much relied upon by appellant, Missouri Pacific Railroad Co. v. Boone, supra. In that case the baggage was checked and the ticket was bought in 1922, long after the termination of federal control and long subsequent to the end of the guaranty period. There was in that case no action by any state authority equivalent to the order of the Texas Commission dated August 21, 1920, nor was there anything equivalent to the action of the Interstate Commerce Commission in Docket No. 11,764, to which reference will be hereafter made. Here, however, there was a continuation of the federal power through the federal control period and through a portion of the guaranty period, up to August 21, 1920, and on that date there was an exertion of state power by which the 11-cent rate was raised to 14½ cents. This 14½-cent rate remained in effect after the end of the guaranty period, and its validity rested not only upon the federal power which had brought the lumber rate to 11 cents, but also upon the order of the Texas Commission, which had brought it to and kept it at 14½ cents.

"4. The principal Texas railways, including the defendants herein, being dissatisfied with the order of the Railroad Commission of Texas ordering an increase of 33⅓ per cent. filed a complaint with the Interstate Commerce Commission, Docket No. 11,764, alleging that the 33⅓ per cent. increase constituted an unjust discrimination against interstate commerce in view of the fact that in southwestern territory, which included Texas, the Interstate Commerce Commission, ex parte 74, had authorized an increase of 35 per cent., and prayed that this discrimination might be removed.

"By a report and order dated February 12, 1921, in Docket No. 11,764, 60 I. C. C. 421, to which reference is here made for all purposes, the Interstate Commerce Commission found that the increases made by the carriers pursuant to the findings of the Interstate Commerce Commission in ex parte No. 74, 58 I. C. C. 220, to which reference is also made, in the charges for freight service, including the transportation of lumber, had resulted in reasonable rates and charges for interstate transportation within the rate group including the state of Texas, and that the failure of the carriers to increase correspondingly all of their rates, fares, and charges for intrastate traffic within the state of Texas had resulted and would thereafter result in undue and unreasonable advantage and preference to persons and localities in intrastate commerce within the state of Texas; in undue and unreasonable prejudice to persons and localities in interstate commerce; in unjust discrimination against interstate commerce, and in intrastate rates and charges lower than the corresponding rates and charges contemporaneously maintained upon the interstate traffic within the state of Texas; and it further found that such undue preference and prejudice and unjust discrimination should be removed by making increases in such intrastate rates and charges corresponding with

the increases previously made in interstate rates and charges.

"The increases authorized by the report and order last mentioned would have no effect upon a rate which, prior to August 26, 1920, had been 7½ cents, because an increase therein of either 33⅓ per cent. or 35 per cent. would result in an advance thereof to 10 cents, but the effect of this last-mentioned report and order would be to increase any rate which, prior to August 26, 1920, had been 11 cents to 15 cents, whereas an increase therein of only 33⅓ per cent. would have resulted in an increase to only 14½ cents.

"The change, if any, from 33⅓ per cent. increase to the 35 per cent. increase became effective March 5, 1921.

"Between March 5, 1921, and May 20, 1922, no changes were made in the rates applicable to any of the shipments involved herein.

"For the validity of the 15-cent rate actually charged and collected, we revert, therefore, to another exercise of federal power under section 13 of the Interstate Commerce Act (49 USCA § 13). To support this order of the Interstate Commerce Commission in Docket No. 11,764, we need not look beyond the provisions of section 13 of the Interstate Commerce Act, and a previous decision of the Supreme Court in the so-called Shreveport Case, Houston, East & West Texas Railroad Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341. But if further authority is wanted, it may be found in Colorado v. United States, 271 U. S. 153, 163, 46 S. Ct. 452, 70 L. Ed. 878, 883, in which the court said:

" 'The exertion of the federal power to prevent prejudice to interstate commerce * * * is similar to that exerted when a State establishes intrastate rates so low that intrastate traffic does not bear its fair share of the cost of the service.'

"Reference may also be had to Railroad Commission v. Chicago, Burlington & Quincy Railroad Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086, and to New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385.

"In their brief counsel for appellant say that:

" 'The only way by which the appellees could avoid the application of the Railroad Commission's regulation or order was to establish that by virtue of some superior power over intrastate commerce the Federal government has made or enacted certain laws that supersede the acts of the State of Texas. * * *'

"With respect to the increase in the rate from 14½ cents to 15 cents that is exactly what we claim. We rely on the order of the Railroad Commission of Texas of August 21, 1920, to sustain the validity of the 14½-cent rate; but to sustain the validity of the 15-cent rate we assert that the order of the Interstate Commerce Commission, in Docket No. 11,764, reversed and suspended previous action of the Texas Commission, just as had been the case with the order of the Interstate Commerce Commission which was involved in the Shreveport Case, and had the effect of initiating a new and valid rate of 15 cents per 100 pounds."

It follows that the judgment of the trial court should be affirmed; that order has been entered.

Affirmed.