# Constitutionality of Legislation Establishing the Cost Accounting Standards Board

If the Cost Accounting Standards Board (CASB) is viewed as an Executive Branch entity, the statutory mechanism for appointing its members is unconstitutional under the Appointments Clause; however, it can be argued that the CASB is a Legislative Branch entity, and that its action in promulgating cost accounting standards is advisory with respect to executive agencies.

The Department of Justice has a duty to defend the constitutionality of a statute except in exceptional circumstances, and it thus may be appropriate to bring to a court's attention any plausible argument that would permit the court to uphold a statute.

June 19, 1980

## MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CIVIL DIVISION

This responds to your memorandum informing us of the position your Division plans to take in pending litigation regarding the constitutionality of the statute establishing the Cost Accounting Standards Board (CASB), Pub. L. No. 91-379, Title I, 84 Stat. 796, 50 U.S.C. App. § 2151 *et seq.* Since receiving your memorandum, we have kept in touch with the staff attorney in your Division handling the matter, and have learned that the constitutional issue has not yet been briefed. We believe that the position elaborated in your memorandum is persuasive. We essentially agree with your analysis that, insofar as the CASB is viewed as an Executive Branch entity whose members are to be appointed pursuant to the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, the statute establishing the CASB is unconstitutional because the mechanism it creates for appointing members is not in conformity with that clause.[1]

Although you have not formally asked for our opinion on the constitutional issue, because of its importance we wish to take this opportunity to comment. We think that an additional, plausible argument could

---

[1] The CASB comprises the Comptroller General and four others appointed by him. Although the Comptroller General—who is appointed by the President by and with the advice and consent of the Senate, *see* 31 U.S.C. § 42—is appointed in conformity with the Appointments Clause, the other four members are not. For the Comptroller General is properly viewed as a Legislative Branch official, and thus not as "head" of a "Department" for purposes of the Appointments Clause. *See Buckley* v. *Valeo,* 424 U.S., 1, 127 (1976); 31 U.S.C. § 43, 53, 65(d); Reorganization Act of 1949, 63 Stat. 205; Reorganization Act of 1945, 59 Stat. 616; Corwin, *Tenure of Office and the Removal Power,* 27 Colum. L. Rev. 353, 396 (1927); W. Willoughby, The Legal Status and Functions of the General Accounting Office of the National Government 12-16 (1927); *cf.* H. Mansfield, The Comptroller General 74-92 (1939).

be made that would permit a court to uphold the statute. Given the Department's duty to defend the constitutionality of statutes except in exceptional circumstances, it may well be appropriate to bring this argument to the court's attention.

At bottom, your analysis would appear to presume that the statute establishing the CASB and providing that its cost accounting standards "shall be used" by executive agencies creates an entity with the power to issue binding standards that must be followed by the Executive Branch. *See* 50 U.S.C. App. § 2168(g). This interpretation apparently accords with the relevant administrative practice, and is consistent with the facts of this case. However, it can be argued that the CASB is really a Legislative Branch entity, and that its action in promulgating cost accounting standards is appropriate to such an entity since it is, in the final analysis, advisory with respect to executive agencies. This approach, of course, avoids the Appointments Clause question.

The view that the CASB is a Legislative Branch entity rests on the statute establishing it as "an agent of the Congress," which is to be "independent of the executive departments. . . ." 50 U.S.C. App. § 2168(a). The description of the CASB as an "agent of the Congress" recurs in the legislative history, *see* S. Rep. No. 91-890, *reprinted* 1970 *U.S. Code Cong. & Admin. News* 3768, 3772. Congress cannot constitutionally delegate to a Legislative Branch entity the authority to impose binding substantive regulations on the Executive Branch, for that would violate basic separation of powers principles, as this Department has often noted in the context of so-called "legislative veto" devices. *See, e.g.,* Letter from Assistant Attorney General Parker to Chairman Ribicoff on S. 1945, April 21, 1980; opinion of the Attorney General to the Secretary of Education, June 5, 1980.*

On the other hand, a Legislative Branch entity can take action in aid of the legislative functions of Congress, such as gathering information or investigating executive agencies. *See Buckley* v. *Valeo, supra,* 424 U.S. at 137-38. It could be argued here that, insofar as the cost accounting standards are advisory, their promulgation is justified as in aid of Congress' oversight of government contracts, for it seems clear that Congress is served by receiving uniform information about the cost accounting practices of government contractors. Although the statute provides that the CASB's standards "shall be used" by government agencies and contractors, it could be suggested that this language does not unequivocally purport to bind executive agencies. First, it is an accepted canon of statutory construction that courts will seek, if at all possible, to construe a statute to avoid a serious question of its constitu-

---

*NOTE: The text of the Attorney General's opinion of June 5, 1980, appears in this volume at p. 21. *supra.* Ed.

tionality.[2] Second, in this case, a court might construe the direction that the CASB's standards "shall be used" by executive agencies not to require that agencies follow such standards absolutely, but merely to require them to "use" the standards, which could include deciding whether to follow them in a given case.

This interpretation draws support from the ordinary meaning of the verb "to use," which indicates "any putting to service of a thing, usu[ally] for an intended or fit purpose . . .", Webster's Third New International Dictionary 2524 (1976), or employing a thing "for a certain end or purpose." *First Federal Savings & Loan Ass'n* v. *Williams,* 91 N.E. 2d 34, 36 (C.A. Ohio 1947); *See. Yandle* v. *Hardware Mutual Ins. Co.,* 314 F.2d 435, 437 (9th Cir. 1963). The meaning of the verb must be ascertained with reasonable regard for the context in which it is employed. *See McJimsey* v. *City of Des Moines,* 2 N.W. 2d 65, 68 (Iowa 1942); *In re Holmes' Estate,* 289 N.W. 638, 640 (Wis. 1940). It would stretch the ordinary meaning of "to use" to say that, standing alone, it means that in every situation regardless of the fitness of a thing to a given case, the thing *must* be employed.

Accordingly, in the present context, it is possible to argue that the phrase "shall be used" should be construed to permit agencies, while being generally guided by the CASB's cost accounting standards, not to follow given standards when the agency considers that they would impinge on the Executive Branch's responsibility to execute the laws and thus would not be "fit" for a particular case. In particular, in putting the CASB's standards into service "for a fit purpose," an agency might choose not to follow a standard if it infringes on the agency's responsibility of negotiating or administering public contracts.

This reading of the statutory language would appear to be consistent with the Department's view of it when it was in the form of an enrolled bill. In a memorandum to the Director of the Office of Management and Budget, the Deputy Attorney General suggested that the creation of the CASB apart from the Executive Branch might be justified on the ground that the Legislative Branch, in performing its normal oversight functions, may reasonably expect, and certainly would be assisted by, consistency and uniformity in the information it receives about public contracts, such as would be fostered by adherence to cost accounting standards. Viewing the statutory language on its face, the Deputy Attorney General was unable to conclude that it would inevitably lead to conflicts of constitutional proportion between the CASB and the Executive Branch, for that ". . . would depend on the substance of the standards and regulations adopted by the Board." Al-

---

[2] *See, e.g., United States* v. *Rumeley,* 345 U.S. 41, 45 (1953); *Crowell* v. *Benson,* 285 U.S. 22, 62 (1932); *Missouri Pacific R.R. Co.* v. *Boone,* 270 U.S. 466, 471–72 (1926); *United States* v. *Delaware & Hudson Co.,* 213 U.S. 366, 407–08 (1909); *see also Ashwander* v. *TVA,* 297 U.S. 288, 348 (1936) (Brandeis, J., concurring).

though the Deputy Attorney General feared that, as applied, the statute might eventually generate disputes between the Congress, with its interest in receiving information about public contracts, and the Executive Branch, with its interest in managing the negotiation and administration of public contracts, the Deputy's memorandum apparently took for granted that the statute *could* be given a facially constitutional reading.

In sum, we are in substantial agreement with the analysis of your memorandum. But we offer for your consideration the further argument outlined above which, if accepted by the court, could prevent the statute from being held to be unconstitutional.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
