## MICHIGAN CENT. R. CO. v. MICHIGAN PUBLIC UTILITIES COMMISSION et al.

(District Court, E. D. Michigan, S. D. January 24, 1921.)

1. **Courts ⬅102—Application for preliminary injunction on ground that state statute conflicts with federal statute must be heard by three judges.**

    A suit to enjoin enforcement of a state statute, on the ground that it is in conflict with a valid federal statute, is based on its unconstitutionality, within the meaning of Judicial Code, § 266 (Comp. St. § 1243), requiring an application for preliminary injunction in such cases to be heard by three judges.

2. **Railroads ⬅5½, New, vol. 6A Key-No. Series—Intrastate rates continued in effect by federal Transportation Act until thereafter changed.**

    By Transportation Act Feb. 28, 1920, § 208a, providing that rates in effect on February 29, 1920, should continue in force "until thereafter changed by state or federal authority, respectively, or pursuant to authority of law," it was clearly intended that state statutes or regulations fixing intrastate rates, which were suspended during federal control, should not automatically again go into effect on the cessation of such control, but that, in view of the recognized large increase in cost of operation during such control, which would render such pre-control rates confiscatory, the rates then in effect, both interstate and intrastate, should continue in force until thereafter changed by competent authority to reasonably conform to changed conditions.

3. **Statutes ⬅217—Construction may be aided by reference to legislative committee reports.**

    Reference to committee reports, and to what is said by the chairman of the committee in explaining the meaning of a bill, is proper in ascertaining the meaning of the statute.

4. **Railroads ⬅5½, New, vol. 6A Key-No. Series—State legislation held not a "change of rates," under federal Transportation Act.**

    Pub. Acts Mich. 1919, No. 382, prescribing maximum passenger rates, though passed during federal control and by its terms to take effect only on termination of such control, *held* not a change of rates in conformity with Transportation Act Feb. 28, 1920, § 208a, providing that rates then in effect should remain in force until "thereafter changed."

5. **Railroads ⬅5½, New, vol. 6A Key-No. Series—Rate provision of federal Transportation Act valid.**

    Transportation Act Feb. 28, 1920, § 208a, providing that rates in effect February 29, 1920, at the termination of federal control, should continue in force "until thereafter changed by state or federal authority, respectively, or pursuant to authority of law," as applied to intrastate rates, *held* valid as an exercise of the war powers of Congress, incidental to federal control of the railroads and their return to their owners under vitally changed conditions created during such control.

6. **Public service commissions ⬅24—Undertaking to refund excess charges required.**

    While a bond will not necessarily be required from a plaintiff who seeks an injunction to enforce the dominance of a federal statute, yet such a plaintiff must undertake to submit to the final decree for refunding any excess payments it receives by aid of the injunction.

In Equity. Suit by the Michigan Central Railroad Company against the Michigan Public Utilities Commission, Merlin Wiley, Attorney General of Michigan, and others. On motion for preliminary injunction. Granted.

Frank E. Robson, J. W. Dohany, and John C. Bills, all of Detroit, Mich., Alex. L. Smith, of Toledo, Ohio, A. A. McLaughlin, of Evanston, Ill., and W. K. Williams, of Detroit, Mich. (A. E. Miller, of Marquette, Mich., Carl R. Henry, of Alpena, Mich., E. M. Davis, of Grand Rapids, Mich., A. H. Lossow, of Minneapolis, Minn., O. W. Dynes, of Chicago, Ill., F. W. Sargent, of Des Moines, Iowa, Bertrand Walker, of Chicago, Ill., and Stanley W. Merrell, of Cincinnati, Ohio, of counsel), for plaintiff.

Before DENISON, Circuit Judge, and KILLITS and TUTTLE, District Judges.

PER CURIAM. This is an application for a preliminary injunction, heard before three judges pursuant to section 266 of the Judicial Code (Comp. St. § 1243).

For several years before 1919, the Michigan statute had fixed the rate for intrastate railroad passenger transportation (with exceptions not now material) at the sum of 2 cents per mile. Act No. 382 of the Public Acts of 1919, approved May 13, 1919, fixed it at 2½ cents per mile (with similar exceptions), but contained this proviso:·

"This act shall not apply to any railroad, the control of which has been taken over by the federal government, while under such federal control."

The Michigan Central Railroad, and each of the 12 other railroads whose similar applications are heard with this, had passed into and remained under federal control, pursuant to the act of Congress approved March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), and the presidential proclamations thereunder. During this period of federal control, the passenger rate for intrastate transportation had been fixed at 3 cents per mile, and this was the rate on February 29, 1920. On February 28, 1920, the act of Congress known as the Transportation Act (41 Stat. p. 456), was approved. It was thereby provided that the railroads should be returned to their owners and federal control should cease on February 29 (March 1), 1920, but that, until September 1, 1920, the government would guarantee the railroads a certain prescribed net return. Section 208a of the Transportation Act is as follows:

"All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by state or federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or charge is approved by the commission."

Upon the theory that federal control, within the meaning of the Michigan act of 1919, would terminate, at the latest, on September 1, 1920, the Michigan Public Utilities Commission gave notice to the railroads that on and after that date the fare must be reduced to 2½

cents. The bills in these cases were filed against the commission and the Attorney General and one of the prosecuting attorneys, to enjoin proceedings to enforce the Michigan act. The jurisdiction of this court is invoked, because the case arises under the laws of the United States, and because the 2½-cent rate would be confiscatory, and because the severity of the penalites would deprive the railroad of the equal protection of the laws. Upon the hearing of this motion, sole reliance is placed upon the effect of the Transportation Act.

[1] No question has been raised about the propriety of constituting a court pursuant to section 266; but we do not overlook some possible uncertainty in this matter. This injunction is not sought "upon the ground of the unconstitutionality of such statute," in the more common sense in which we speak of unconstitutionality. That there is a conflict between state and federal law does not always bring to mind the issue of the unconstitutionality of the former; yet it is prescribed by the federal Constitution that it and the laws and the treaties made in pursuance thereof shall be the supreme law of the land, and it seems to follow that a state statute which is in conflict with a federal statute, when the latter is pursuant to and within the power given by the federal Constitution, is, in a very fair sense, unconstitutional. We think the present situation is fully within the spirit and fairly within the letter of section 266, and that the court, as now constituted, has power to hear and determine the application. Even if otherwise, the District Judge, in whom the power would rest if the special court were not required, joins in this opinion and in directing the entry of the order thereon.

[2] Prior to the taking over of federal control, a complete system of intrastate rates existed in many or all of the states, and these rates were fixed, sometimes directly by statute, and sometimes by regulatory bodies. It was recognized that these intrastate rates were within the state jurisdiction, and were not a matter of federal control, save to a degree and in contingencies not here important. Undoubtedly all these various state laws and regulations were suspended by the operation of the Federal Control Act, and, having been thus merely suspended, and not repealed, they would automatically take effect again at the end of the suspension; that is, at the termination of the federal control. Tua v. Carriere, 117 U. S. 201, 209, 6 Sup. Ct. 565, 29 L. Ed. 855. If Congress, in passing the Transportation Act, intended that this automatic reversion should occur, that is the end of the matter, and the commission was right in proposing to enforce the Michigan act after September 1st; but, if Congress intended otherwise, we come to further questions. The congressional intent must, therefore, be ascertained.

To us the intent seems very clear upon the face of the statute. We take notice of the orders of the Director General and of the Interstate Commerce Commission under which, during the period between March 21, 1918, and February 29, 1920, the cost of railroad operations had enormously increased and the rates had been advanced in an effort to provide the increased cost. We take notice, also, of the general

271 F.—21

change in conditions, such that, in February, 1920, perhaps no one could have been found who would contend that it would be fair or reasonable to reduce the railroad rates to the figures prevailing before the war and leave the roads subject to the permanently fixed and greatly increased costs of operation. It would seem most natural and reasonable that the rates, both interstate and intrastate, should remain at the figures then existing until the proper authority, federal with reference to one and state with reference to the other, should have opportunity to investigate the situation as it might then exist, and determine whether or not any change should occur. In apparent execution of this natural intent, we find the statute saying that the rates in effect on February 29, 1920, shall continue in force, "until thereafter changed by state or federal authority, respectively, or pursuant to authority of law," and then providing that in no event shall the rates be reduced before September 1, 1920, unless with the approval of the Interstate Commerce Commission. It would be a strained construction of language to say that the mere automatic reversion to the pre-control status, which would have occurred on February 29, if the Transportation Act had made no inconsistent provision, is that change, subsequent to February 29, which the act contemplates when it speaks of "thereafter changed." Not only is it plain to us, by the words of the law, that Congress intended the then existing rates to continue until the regulating authority should, by due action thereafter taken and in view of the new situation, make a change; but, if there were doubt about it, the proceedings in Congress would remove the doubt.

It will be observed that there is no distinction in section 208a between freight and passenger rates, nor between interstate and intrastate rates. The latter were, at this time, within the power of Congress, and the intent to reach them is clear from the reference to changes made by state authority, because such changes could refer to nothing else. The question whether automatic return to pre-control rates was desired would be the same as to interstate and intrastate, freight and passenger, matters. The bill, which later became the Transportation Act, was reported by the House committee on interstate commerce November 10, 1919. Report 456, 66th Congress. In this report, the committee refers to this clause, which then contained only the words, "until thereafter changed by or pursuant to authority of law," and points out that without such a provision all the rates would immediately revert to their pre-control status, and continues:

"In view of the enormous increase in operating costs of carriers, due to increased wages and cost of materials, restoration to former level would result in such enormous decrease in revenues as would render it utterly impossible, even for the stronger railroads, to meet operating expenses. By the insertion of the above section, the existing rates, fares, charges, etc., are to continue in force and effect until changed by or pursuant to authority of law; that is, until changed by the appropriate regulatory body."

The chairman of the House committee, in presenting this bill (Congressional Record, Nov. 11, 1919, p. 8314), in speaking of this provision for continuing the rates in effect, said:

"It is apparent that, unless we put in a provision of this kind, then, as soon as the federal control ended, all the rates made under federal control would cease, and the rates would revert to their pre-control status—both interstate and intrastate. It is clear to all that that would be calamitous. If the rates of the federal railroads now existing, as fixed by the Director General, should suddenly be brought to a pre-control level, there would be scarcely a railroad in the United States that could begin to pay operating expenses. * * * If control ceases without this section in the bill, the rates would be dropped 25 per cent. on freight and 50 per cent. on passengers, with the consequences I have already stated."

Later the section was amended by inserting the words "state or federal authority, respectively," so that it took the form in which it passed. The member of the House committee who then seemed to be in charge of the bill had pointed out that this language was intended to reach both the state authority and the federal authority, each within its proper regulatory scope, when a member proposed to amend by inserting:

"Provided, that nothing in this section shall be construed to include intrastate shipments."

The member in charge of the bill replied:

"That is not the intention. They are continued until the proper state authorities can pass upon them. Otherwise, they would come back to pre-war rates." Congressional Record, p. 8451.

The proposed amendment then seems to have been abandoned.

[3] Reference to committee reports, and to what is said by the chairman of the committee in explaining the meaning of the bill, is proper in ascertaining its intent (Duplex Co. v. Deering [U. S. S. C., Jan. 3, 1921] 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. ——), and these references seem to us to demonstrate that Congress intended to prevent the automatic reapplication of the superseded pre-control rates, either state or federal.

[4] It is true that the Michigan commission does not propose to revive any pre-control rate, since the Michigan act in question was not passed until May, 1919; but, while this distinction gives color of difference, we think there is none in principle. All pre-control state regulations and statutes were suspended during the period of federal control by the application of the familiar rule of law upon that subject. The Michigan statute of 1919 was suspended during the same period of federal control, but by its express words. The Transportation Act speaks as of February 29, 1920, and its insistence upon a change "thereafter" made is no better satisfied by a state statute passed in 1919, and suspended by its terms during federal control, than by one passed in 1917 and suspended during the same period by operation of law. The best that can be said is that the reasons of Congress for not permitting the Michigan act of 1919 to come into automatic effect would not have been quite so strong as the same reasons were which applied to older regulations; but the language used does not permit of any distinction. Indeed, it might be said—though we are not very strongly impressed with the suggestion—that since the Transportation

Act expressly declares that federal control of existing state rates does not cease until the state thereafter takes affirmative action, the very period of suspension provided by the words of the Michigan statute has not yet expired.

[5] Being satisfied as to congressional intent, the remaining question is one of power. It is urged on behalf of the railroads that under the terms of other portions of the Transportation Act it has come about that the fixing of an intrastate rate has such a direct effect upon the interstate rates as to justify Congress in taking over absolutely and permanently the whole matter of intrastate rates, and that Congress has done so. The contrary is forcefully argued, on behalf of the state. We find it unnecessary to consider these contentions, because we think the congressional right to effectuate the intent which we have found in section 208a is sufficiently based on the war power. The right to fix intrastate rates during federal control and as incidental to the war power is settled. Northern Pac. Co. v. North Dakota, 250 U. S. 135, 148, 39 Sup. Ct. 502, 63 L. Ed. 897. It is also beyond dispute —indeed, it is not denied by the Attorney General here—that the same power would extend to and cover federal regulation of state rates for a reasonable transition period (Stewart v. Kahn, 78 U. S. [11 Wall.] 493, 506, 20 L. Ed. 176), as incidental to the return of the railroads to their owners, covered by a shield which should prevent their immediate destruction; but it is claimed that the six months from March 1st to September 1st, during which the federal guaranty continued, exhausts such transitional or twilight period, and it is pointed out—as is true— that the effect of the construction which we give to this statute and of holding it valid to that extent is not merely to embarrass temporarily the state jurisdictions, but is really to abrogate the entire structure of rates, charges, etc., as made by statute or by commission, in every state of the Union where such structures existed. Every such state must begin again.

On the other hand, while there is, for the time being, a complete abrogation, yet this is only during the acquiescence and approval of the states. They may, so far as this question is concerned, restore their pre-control structures at any time by a statute or an order of ten words. It also may be noted that section 210 of the Transportation Act specifies two years as a reasonable transition period for the retention of certain collateral federal powers, and this period has not yet expired.

We cannot think that Congress exceeded its war powers in this particular. It was delivering back the railroads to their owners, saddled with burdens which made the rates of a year or two earlier quite impossible. In making this return, it was certainly proper for Congress to fix conditions which should preserve the property temporarily from the immediate destruction that would otherwise surely result; and Congress, in effect, declared that these existing rates, which had proved to be necessary during the war, were also necessary until the still existing war conditions should be materially modified. It turned over the property to the owners, and (as we are now assuming) it returned to the states the power of regulatory control, saying only that this control

must not be exercised without a fresh consideration of what would be right and proper. We are content to rest our conclusion upon this construction of the war power.

We have been compelled to consider these questions practically as matters of first impressions. We are informed that a similar court in the Second Circuit has reached the contrary conclusion, Circuit Judge Ward and District Judge Cooper concurring, and Circuit Judge Hough dissenting, and that three judges in the Eighth Circuit, Circuit Judge Sanborn, and District Judges Wade and Woodrough, have reached the same conclusion we do; but in neither case is there more than a bare announcement of the result.

The temporary injunction should issue as prayed for. We are informed that a proceeding has been commenced in one of the state courts to prevent the application to intrastate transportation of rates fixed by the Interstate Commerce Commission under the claimed authority of the Transportation Act. No conflict between the jurisdiction acquired by this court upon the filing of the bills in these cases and the jurisdiction asserted by the state court in that matter has been pointed out, and all counsel disclaim the existence of any such conflict. The injunction to be issued is not intended to affect or embarass the progress of that litigation; although, if any conflict of jurisdiction should hereafter be claimed to exist or develop, the subject will be open for further consideration.

[6] There is precedent in this circuit which suggests the requirement of a bond or some other security from the railroad company that it will refund to the passengers one-half cent per mile in case the 2½-cent fare shall eventually be held lawful; but this precedent is in a case where plaintiff's right depended upon establishing the fact of confiscation, and where it was evident that there would be long delay. Here the Attorney General has not asked for a bond or other security, the controlling question is one of law, and does not seem to us doubtful, and there is no reason to anticipate long delay in getting the opinion of the Supreme Court upon one of the earlier cases, if not upon this. Under such circumstances, we do not think it necessary to order security. If any of these conditions change, an application will be entertained at any time.

However, in view of the suggestion in Minneapolis Co. v. Washburn Co. (U. S. S. C., Dec. 20, 1920) 254 U. S. 370, 41 Sup. Ct. 140, 65 L. Ed. ——, each railroad, as a condition of getting its injunction issued, should.file herein its consent and undertaking, in form and details approved by the judge of the district, that in case it shall finally be adjudged that 2½ cents has been the lawful fare, an accounting may be had at the foot of the decree in this case in which judgment may be rendered against the railroad in favor of each passenger for the excess fare wrongfully collected, and that, in such accounting, the excess payments may be established by such convenient method of informal proof as the court may direct.