## HUME v. MAHAN, Secretary of State of Kentucky.

### No. 1143.

District Court, E. D. Kentucky.

Sept. 3, 1932.

which provides that Representatives in Congress from each state shall be elected by districts composed of contiguous and compact territory containing as nearly as practicable an equal number of inhabitants.

When this suit was first called to my attention, I was not satisfied in my own mind that the case was one that might be heard and determined by a district judge, without calling to his assistance two other judges, as provided in section 266 of the Judicial Code, section 380, title 28, USCA. I accordingly invited MOORMAN, Circuit Judge, and DAWSON, District Judge, to sit with me, which they did. Upon the hearing it was assumed by counsel on both sides that the case was one which required a hearing by three judges. Judges MOORMAN and DAWSON are of opinion, however, it is not such a case, but that the matters involved may be determined by the District Judge alone. I am not myself sure that this is not correct. Section 266 of the Judicial Code provides for three judges where the claim is that the statute of a state is unconstitutional. The claim here is not that the legislation in question is unconstitutional, but that it is violative of a federal statute. Hence it is not within the letter of the three-judge provision though it may be within the spirit. Cf. Michigan Central Railroad Co. v. Michigan Public Utilities Commission (D. C.) 271 F. 319–321. In deference, therefore, to the views of the judges who sat with me, and in view of my own doubt on the subject, the opinion is handed down as my opinion. In order, however, that the defendants may not be cut off from any right of appeal from the decision herein as a three-judge decision, if they are of opinion that it is a case that requires a decision of such a court and not one which a single judge is authorized to determine, I am authorized to say that both Judges MOORMAN and DAWSON concur in the results that I have reached, and both have, for the purpose indicated, signed an order in conformity therewith, granting the injunction sought.

The defendant attacks the jurisdiction of this court, as a federal court, on the ground that the jurisdictional amount is lacking; and, as a court of equity, on the ground that the matter involved is political in its nature. Each attack will be considered in its order.

Whilst plaintiff's original bill seeks relief both as a taxpayer and as a legally qualified congressional elector, it is quite apparent from the record that plaintiff's interest as a taxpayer is not in excess of $3,000, and if plaintiff is entitled to maintain his action, he must do so in his capacity as a legal voter

Cleon K. Calvert, of Pineville, Ky., for plaintiff.

Bailey P. Wootton, Atty. Gen., Sam H. Brown and Francis M. Burke, Asst. Attys. Gen., and John Allen, of Lexington, Ky., for defendant.

ANDREW M. J. COCHRAN, District Judge.

This is an action in equity for an injunction against the defendant, the regularly elected, qualified, and acting secretary of state of the commonwealth of Kentucky, to restrain her from certifying to the county court clerks of the counties comprising the nine congressional districts laid off by the provisions of chapter 145 of the 1932 Act of the General Assembly of the Commonwealth of Kentucky, under the congressional reapportionment following the fifteenth decennial census, the names of candidates for the nomination of their respective parties for Representatives in Congress in the respective districts so laid off. The basis of the action is that chapter 145 violates section 3 of the Act of August 8, 1911 (title 2, § 3, U. S. C. [2 USCA § 3]),

entitled to participate in congressional elections. It is well settled that the right to vote is a valuable right, capable of being measured in money, and that federal courts as such, in a proper case, have jurisdiction to redress deprivation of this right. Wiley v. Sinkler, 179 U. S. 58, 21 S. Ct. 17, 45 L. Ed. 84; Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759; Nixon v. Condon, 286 U. S. 73, 52 S. Ct. 484, 76 L. Ed. 984, decided by the Supreme Court of the United States May 2, 1932. In the case of Giles v. Harris, 189 U. S. 475, 23 S. Ct. 639, 641, 47 L. Ed. 909, it was said: "We have recognized, too, that the deprivation of a man's political and social rights properly may be alleged to involve damage to that amount, capable of estimation in money."

■■ Possibly the right of equal representation in Congress is likewise capable of estimation in money. But the bill and amended bill contain no allegation to the effect that plaintiff's right in this respect exceeds the sum or value of $3,000. The original bill does contain an allegation that the amount in controversy exceeds the sum or value of $3,000; but a careful reading of the bill discloses that this allegation is made in respect of the cost which would be incurred by the state and counties in holding a congressional election in the alleged illegal districts. Therefore, on the face of the bill and amended bill, if this court as a federal court has jurisdiction of this controversy, this jurisdiction must be found in some provision of section 24 of the Judicial Code (title 28, section 41, U. S. C. [28 USCA § 41]) which does not make the amount in controversy a jurisdictional requirement. Section 24 of the Judicial Code, after enumerating certain cases in which the sum or value of the amount in controversy must exceed $3,000, contains the following provision: "The foregoing provision as to the sum or value of the matter in controversy shall not be construed to apply to any of the cases mentioned in the succeeding paragraphs of this section." Paragraph 1. One of the succeeding paragraphs referred to is paragraph 14, which gives federal court jurisdiction "of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, or usage, of any State, of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States."

In my opinion federal jurisdiction of this cause exists under this provision. It is a suit in equity to redress the deprivation under color of a statute of this state of a right secured by a law of the United States providing for equal rights of its citizens—the right of approximately equal representation in Congress. It is so secured by section 3 of the Act of August 8, 1911 (37 Stat. 14 [2 USCA § 3]), which according to my interpretation of the decision in Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. Ed. 795, is still in force. It provides: "In each State entitled under this apportionment to more than one Representative, the Representatives to Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants."

This provision was enacted under authority of section 4 of article 1 of the Federal Constitution, which empowers Congress to make regulations as to the times, places, and manner of holding elections for Representatives. Section 2 of the Fourteenth Amendment provides for approximately equal representation amongst the several states. The necessary result of such an apportionment is to put the whole body of people in each state on a voting equality with those in every other state; and if, under this plan of apportionment, each state should choose its Representatives in Congress from the state at large, each congressional voter in each state would not only be on a voting equality in congressional elections with every other vote in his own state, but he would be on an equality with every other such elector in every other state.

Section 3 of the act of 1911, enacted pursuant to the Constitution, provides for such representation amongst the citizens of the several states. The right thereto is thereby conferred upon them and secured to them.

Until 1842 the respective states were left to their own devices as to the manner of electing Representatives in Congress. Some were elected from the state at large, but in a large part the states were divided by their respective Legislatures into congressional districts and their Representatives in Congress were elected from these districts. For the first time, by the Act of June 25, 1842 (5 U. S. Statutes at Large, 491), the Congress asserted its power over the method of selecting its members. Section 2 of that act required that Congressmen should be elected by districts

composed of contiguous territory, but no provision was made for equality of population.

The law continued in this condition until 1872, when Congress, by the Act of February 2, 1872 (17 U. S. Statutes at Large, 28), added to the requirement of contiguous territory the further requirement that each district should contain as nearly as practicable an equal number of inhabitants, and similar provisions were incorporated in the Act of February 25, 1882 (22 U. S. Statutes at Large, 5), and in the Act of February 7, 1891 (26 Statutes at Large, 735). By the Act of January 16, 1901 (31 U. S. Statutes at Large, 733), Congress added to the requirement of contiguous territory and equality of population the further requirement that the districts should be compact, and this provision of the act of 1901 was carried over in identical language into section 3 of the Act of August 8, 1911 (title 2, § 3, U. S. C. [2 USCA § 3]).

■ The defendant contends that Congress was without authority to enact section 3 of the Act of August 8, 1911 (title 2, § 3, U. S. C. [2 USCA § 3]). As to this there is this to be said: Section 2 of article 1 of the Constitution, as modified by section 2 of the Fourteenth Amendment, provides that Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. Section 4 of article 1 provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

The contention of defendant is that section 4 of article 1 vests in the respective state Legislatures the primary power to provide for the time, place, and manner of electing Representatives in Congress, and that this power includes the power of laying off the districts from which Congressmen shall be elected, and that the authority of the Congress extends only to setting aside or modifying the regulations thus enacted by the respective Legislatures. This question should present no difficulty, even if it were one of the first impression. Section 4 of article 1, giving to the Congress the right by law to "make or alter such Regulations," undoubtedly contemplates a power beyond the mere right to modify or alter regulations promulgated through state law; but the matter is

no longer an open question. In a long line of decisions by the Supreme Court it has been definitely established that section 4 of article 1 vests in the Congress the supreme power to regulate the places and manner of electing Representatives in Congress. This power undoubtedly includes the authority to require Congressmen to be elected from districts of as nearly equal population as practicable and composed of compact and contiguous territory. Whenever the Congress enacts laws governing the election of Congressmen, including the character of the districts from which they are to be elected, such laws become the supreme law of the land, striking down all state laws in conflict therewith. See Ex parte Siebold, 100 U. S. 371, 25 L. Ed. 717; Ex parte Yarbrough, 110 U. S. 651, 4 S. Ct. 152, 28 L. Ed. 274; Ex parte Clarke, 100 U. S. 399, 25 L. Ed. 715; United States v. Mosley, 238 U. S. 383, 35 S. Ct. 904, 59 L. Ed. 1355; In re Coy, 127 U. S. 731, 8 S. Ct. 1263, 32 L. Ed. 274; Wiley v. Sinkler, supra; Newberry v. United States, 256 U. S. 232, 41 S. Ct. 469, 65 L. Ed. 913; Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. Ed. 795, decided April 11, 1932.

■ I conclude that section 3 of the Act of August 8, 1911 (title 2, § 3, U. S. C. [2 USCA § 3]), was a valid exercise of the authority vested in Congress by section 4 of article 1 of the Federal Constitution.

The bill alleges that the redistricting act enacted by the last Legislature of this state deprives the plaintiff, a citizen and elector thereof, of the right to approximately equal representation in Congress secured by section 3 of the act of 1911, and the act of defendant there sought to be enjoined will be performed under color of that statute. This suit is brought to redress that deprivation. It is brought to relieve plaintiff of it and to deliver him from it. It is a suit in equity. And it is a "suit authorized by law to be brought." The meaning of the phrase may be met by the consideration that every suit to redress the deprivation of a right is authorized by law to be brought. Where there is a wrong there is a remedy. If its meaning is "authorized by statute to be brought," it is met by section 43, title 8, USCA, Rev. Stat. § 1979, which is in these words: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding."

The defendant, under the color of the congressional redistricting act enacted by the last Legislature of this state is about to take a step, and unless enjoined will take it under color of that statute, which subjects the plaintiff, a citizen of the United States, to the deprivation of his right to approximately equal representation in Congress secured to him by the Federal Constitution and laws and a suit in equity against the defendant to enjoin her taking such step is a suit to redress such deprivation, i. e. to relieve of it and to deliver him from it.

It would seem to be inescapable, therefore, as to the jurisdiction of this court as a federal court that the bill makes out a case.

■■■■ This brings me to the other contention of defendant as to jurisdiction, which is that this court has no jurisdiction in equity of this cause. In considering this question two things must be accepted and kept in mind. One is that the plaintiff has the right to approximately equal representation in Congress, which right is secured to him by the Constitution and the statute law of the United States. The other is that he has no adequate remedy at law in this court to vindicate such right or to redress its deprivation. He certainly could not successfully maintain a common-law action for damages against the precinct election officers in the precinct in which he votes, as was done in the cases of Wiley v. Sinkler, supra; Nixon v. Herndon, supra; and Nixon v. Condon, supra, because no act of theirs, either proximately or remotely, would deprive him of the right asserted in this cause. They had nothing to do with laying off the districts, and no acts of theirs in their official capacity could furnish to him the right of equal representation which he here seeks. The failure to get such equal representation and the failure to obtain the right to vote for a member of Congress in a district composed of contiguous and compact territory could not legally be charged to any dereliction on their part. The same is equally true of the secretary of state, the defendant in this cause. No act of hers contributed to the establishment of the districts complained of, nor can any official act of hers give to the plaintiff the right which he here seeks.

It was suggested at the argument of this case that the plaintiff did have available to him, however, an adequate legal remedy against the secretary of state through a mandamus proceeding to compel her to certify all candidates for Congress as candidates from the state at large, rather than by districts laid off by the 1932 General Assembly. Whether such a remedy is available in the state court I am not called upon to decide. Such a remedy is certainly not available in a federal court, as it is well settled that Federal District Courts are without jurisdiction to entertain original mandamus proceedings. As the plaintiff in this case is entitled to resort to a federal court, the adequate remedy necessary to defeat equitable jurisdiction must be an adequate legal remedy available in the federal court.

Unless, therefore, plaintiff can obtain relief in equity, he is remediless so far as this court is concerned. It would seem that the very fact that one has a right secured by law which has been invaded and that he has no remedy at law to protect it settles that he has such remedy in equity. In the case of Morgan v. Town of Beloit, 7 Wall. 613, 619, 19 L. Ed. 203, it was said: " 'The power is reserved to a court of equity to act upon a principle often above-mentioned namely, that whenever there is a right it ought to be made effectual.' 1 Kaime's Principles of Equity 3. Where there is a right which the common law, from any imperfection, cannot enforce, it is the province and duty of a court of equity to supply the defect and furnish the remedy. Quick v. Stuyvesant, 2 Paige [N. Y.] 84, 92."

And in the cases of Thompson v. Central Ohio R. R., 6 Wall. 134, 137, 18 L. Ed. 765, and Payne v. Hook, 7 Wall. 425, 430, 19 L. Ed. 260, it was said: "The absence of a complete and adequate remedy at law, is the only test of equity jurisdiction."

■■■■ The defendant's contention comes to this, that the federal wrong complained of is one that a federal court is powerless to right —a wrong which section 41 (14), 28 USCA, presupposes that it has power to right in equity if not at law. The basis of the contention is that the right sought to be enforced by redressing its deprivation is a political right and a court of equity has no jurisdiction to enforce such a right, even though it cannot be enforced at law. The decisions involving the question as to jurisdiction in equity of a case which presents what may be termed a political matter are extremely numerous. There is considerable confusion on the subject amongst them and it may be said that they are in conflict. The time at our disposal will not permit of a survey of them. I think, however, that it will be found on careful consideration of those relied on as de-

nying jurisdiction in such a case that many of them present a matter which is purely political or are cases where there was an adequate remedy at law. My view of the matter is that a political right may at the same time be a legal right. Such a right is a right in a political matter. In case of such a right, if it is invaded and there is no adequate remedy at law to protect it, equity has jurisdiction to do so.

The defendant strongly urges that the case of Giles v. Harris, 189 U. S. 475, 23 S. Ct. 639, 642, 47 L. Ed. 909, is conclusive authority for the position that a court of equity has no jurisdiction to enforce a legal right of a political nature. As I view that decision it is an authority to the contrary of this. It upholds the position that a court of equity has such jurisdiction if there is no adequate remedy at law. What is relied on is two expressions of Mr. Justice Holmes in the course of his opinion. He said: "The traditional limits of proceedings in equity have not embraced a remedy for political wrongs." Again he said: "The other difficulty is of a different sort, and strikingly reenforces the argument that equity cannot undertake now, any more than it has in the past, to enforce political rights."

The significance of these expressions will be considered after it is pointed out what was actually decided by the case. It was a suit in equity brought in September, 1902, in the United States Circuit Court for the Northern District of Alabama by a negro against the board of registrars of Montgomery county in that state. The Constitution thereof provided for registration in order to vote. It made a difference in the tests for registration before January 1, 1903, from what they were thereafter. The tests prescribed for the prior registration were easier than those for the later. The registration prior to that date was for life. Probably such was the case for the later. The plaintiff alleged that he was qualified to register under the tests prescribed prior to January 1, 1903. In March, 1902, he applied to the defendants for registration and was refused. Before August 1, 1902, numerous other qualified negroes had so applied and been likewise refused. The bill was filed on their behalf as well as plaintiff. It charged in substance that a scheme had been devised by the great mass of the white population of the state to disfranchise the negroes thereof. The provisions of its Constitution as to registration and voting which they had adopted had been so shaped as to give an opportunity for such disfranchisement. The intention was that they should be so administered as to let in all the whites and keep out a large part, if not all, the negroes. The defendants were parties to this scheme and accepted their offices for the purpose of carrying it out. As was intended, these provisions had been so administered as to effect this purpose. The plaintiff and the negroes on whose behalf the suit was brought, though qualified to register, had been arbitrarily excluded from registering before January 1, 1903, and the same thing had been done all over the state. On the other hand, the white men generally had been permitted to register. The tests prescribed for registration after January 1, 1903, were too severe to permit of the negroes registering thereafter. Furthermore, it was the intention of the great mass of the white population to keep the negroes from ever voting. Based on these allegations it was claimed that these provisions of the Constitution of the state were contrary to the Federal Constitution. The relief prayed was twofold. In substance it was that the defendants be required to enroll the names of plaintiff and the negroes on whose behalf he sued upon the voting lists and that the provisions of the Alabama Constitution relating to registration and voting be declared to be contrary to the Fourteenth and Fifteenth Amendments of the Constitution of the United States. The lower court dismissed the bill for want of jurisdiction as a federal court and for want of equity. The Supreme Court affirmed this decree. It did not do so for want of federal jurisdiction. It held that such jurisdiction existed. It may be said that it affirmed it on the ground of want of equity. This it did, not because of the political nature of the relief sought, but because plaintiff was not entitled to the relief which he sought. He was not entitled to a declaration that the provisions of the state Constitution in question were unconstitutional and void because it would be "a mere declaration in the aid." He was not entitled to the compulsory registration sought for two reasons. One was that according to plaintiff's claim the constitutional provisions as to registration were invalid. The defendants should not be required to proceed to act under an invalid law. The other reason was that such registration would be useless. It would do plaintiff no good. The names of himself and the other negroes on a "piece of paper" would not defeat the intent of the great mass of the white people of the state to keep them from voting. The only possible way in which this could be brought about was for the federal court "to supervise

the voting" by its "officers." This Mr. Justice Holmes said was the "chief purpose" or "main object" of the bill. This relief could not be granted because the state itself could not be sued and the "court has * * * little practical power to deal with * * * the state in a body." He said: "Apart from damages to the individual, relief from a great political wrong, if done, as alleged, by the people of a state and the state itself, must be given by them or by the legislative and political department of the government of the United States."

It was for such a political wrong as that charged in the bill, i. e. the disfranchisement of the negroes by the white people of the state, that Mr. Justice Holmes in the first statement relied on by defendant had in mind when he said equity afforded no remedy for "political wrongs," and it was the right to be free from such a wrong that he had in mind when he said in the second statement that equity could not enforce "political rights." He did not mean by either statement that equity had no jurisdiction to compel the defendants to register the plaintiff and the negroes on whose behalf he sued because of the political nature of the right sought to be enforced. He assumed as a matter of course that it did have such jurisdiction and hence considered the question on its merits. The right to the relief sought was denied, not for want of equitable jurisdiction, but for the two reasons stated, to wit, the registration provisions were invalid and registration would do them no good according to the allegations of the bill. Hence this decision, instead of being an authority for the position that equity cannot enforce a legal right which is of a political nature, is a direct authority in support of the position that it can if there is no adequate remedy at law. It is to be noted that Mr. Justice Brewer, who dissented on the ground that the decision of the Supreme Court should be limited to the question of federal jurisdiction and the decree reversed and case remanded for further proceeding in the lower court, held that the plaintiff was entitled to the relief sought. He said: "That such relief will be given has been again and again affirmed in both national and state courts." And further that Mr. Justice Harlan, who dissented on the ground that the decree of the lower court should be affirmed for want of federal jurisdiction, said: "I agree with Mr. Justice Brewer that it is competent for the courts to give relief in such cases as this."

That there is nothing in the two statements of Mr. Justice Holmes relied on as adverse to the position here taken, and that the decision itself supports it, is evident from two subsequent decisions of the Supreme Court in which Mr. Justice Holmes rendered the opinion.

One of these decisions was in the case of Love v. Griffith, 266 U. S. 32, 45 S. Ct. 12, 69 L. Ed. 157. That case went to the Supreme Court from the appellate court of Texas. 236 S. W. 239. It was a bill in equity brought by a negro to enjoin the Democratic Executive Committee of Houston and the judges of a primary election to be held January 9, 1921, from enforcing a rule made by the committee that negroes should not be allowed to vote at that election. At the time the case came before the Supreme Court that election had already been held. The decree of the lower court was affirmed, because the question was moot and an injunction would have been worthless. It was not affirmed on the ground that plaintiff was not entitled to the equitable relief which he sought. On the contrary, Mr. Justice Holmes, who delivered the opinion, said: "If the case stood here as it stood before the court of first instance it would present a grave question of constitutional law and we should be astute to avoid hindrances in the way of taking it up." This expression leads me to believe that, had the election not been held at the time the Supreme Court delivered its opinion, the political nature of the controversy would not have been regarded by the court as an obstacle to the granting of equitable relief.

The other decision was in the case of Nixon v. Herndon, 273 U. S. 536, 47 S. Ct. 446, 71 L. Ed. 759. It also came to the Supreme Court from Texas. It was an appeal from the judgment of one of the federal courts of that state dismissing a complaint brought by a negro against the judges of a Democratic primary election to recover damages for refusing to permit him to vote at that election, such refusal being based on a statute of the state. It was held that the complainant stated a cause of action and the judgment of the lower court was reversed. It was urged against the complaint that it was an action to enforce a political right. As to this Mr. Justice Holmes, who delivered the opinion of the court, said: "The objection that the subject-matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered

for in a suit at law hardly has been doubted for over two hundred years." It is true that that was an action at law. But he cited in support of the decision not only the decision in Wiley v. Sinkler, which was a law case also, but that in Giles v. Harris, which was an equity one. He saw no difference in the right to enforce a legal right because it is of a political nature, between an action at law and a suit in equity. Why should it be of any significance in a suit in equity that the legal right sought to be enforced is of a political nature when it is of no significance in an action at law?

How far the Supreme Court will go in enforcing a legal right of a political nature appears from the later case of Nixon v. Condon, 286 U. S. 73, 52 S. Ct. 484, 76 L. Ed. 984. After the decision of the Supreme Court in the case of Nixon v. Herndon, the Legislature of Texas enacted a statute repealing the earlier one forbidding negroes from voting in a Democratic primary and providing that the state executive committee of every political body in the state should have power to prescribe the qualification of the members of the party and to determine who shall be qualified to vote at its primary. Thereafter the State Democratic Executive Committee adopted a rule limiting the right of participation in primaries to white persons. It was held that thereby that committee was created a state agency and its rule was in violation of the Federal Constitution and that a negro who had been refused a vote in a Democratic primary had a right of action to recover damages for such refusal.

The position here taken as to equitable jurisdiction is that of the Court of Appeals of Kentucky. Egan v. Grewe, 112 Ky. 232, 65 S. W. 437; Brown v. Rep. County Ex. Com., 119 Ky. 720, 68 S. W. 622; Neal v. Young (Ky.) 75 S. W. 1082; Ragland v. Anderson, 125 Ky. 141, 100 S. W. 865, 128 Am. St. Rep. 242; Stiglitz v. Schardien, 239 Ky. 799, 40 S.W.(2d) 315.

A good presentation of the position here taken is to be found in Gilmore v. Waples, 108 Tex. 167, 188 S. W. 1037, to which my attention has been directed by the opinion of Judge Hutcheson in Grigsby v. Harris (D. C.) 27 F.(2d) 942.

For the reasons stated, I am constrained to hold that equity is competent to give the relief sought.

I come now to a consideration of the validity of the redistricting act.

In dividing the state into congressional districts under the provisions of section 3 of the Act of August 8, 1911, the state Legislature undoubtedly has a wide discretion, and its good-faith exercise should not be disturbed by the court. But where the result leaves no escape from the conclusion that there was no good-faith attempt to comply with the national statutory requirement of practical equality of population and/or of contiguous and compact territory, the court should not hesitate to declare the legislative act void. A study of the redistricting act here involved satisfies me that the General Assembly made absolutely no effort to comply with the federal statutory requirement of practical equality of population and no good-faith effort to meet the requirement of compactness of territory. Indeed, it is difficult to contemplate the result without concluding that the act was framed in deliberate disregard of the federal statute.

The population of the state, according to the 1930 census, is 2,614,589. Under the Congressional Reapportionment Act (2 US CA § 2a), this population entitled Kentucky to nine Representatives in Congress, instead of eleven as formerly allowed. Under an ideal redistricting act each of these nine districts would contain in round numbers 290,500 inhabitants. Owing to the fact that Jefferson county, in which the city of Louisville is located, has a population of 355,350, which is in excess of this number but not enough to make two districts, and owing to the practical considerations against throwing a part of this county into another congressional district, the action of the Legislature in erecting this county into a single district cannot be regarded as a violation of the spirit of the federal act.

After the creation of Jefferson county as a congressional district, there were left one hundred and nineteen counties, with a total population of 2,259,239, out of which to erect the remaining eight congressional districts apportioned to the state. Under an ideal redistricting act each of these eight districts would have in round numbers a population of 282,400. None of these counties has a population of as much as 100,000. One, Kenton county, has in round numbers 93,500; one, Campbell county, has 73,391; and only three others, Fayette, Harlan, and Pike, have in excess of 60,000. The average population of the one hundred and nineteen counties outside of Jefferson is slightly less than 19,000, and the average, eliminating the counties of

Jefferson, Kenton, Campbell, Fayette, Harlan, and Pike, is less than 17,000, and each of seventy-five of the counties has a population of less than this average, and each of twenty-eight of the counties has less than 10,000 population.

In view of this situation, the Legislature was confronted with no difficulty whatever in dividing these one hundred and nineteen counties into eight congressional districts of substantially equal population, and this without the necessity of dividing any county; and the topography of the state presents no obstacle to carving these districts out of contiguous and compact territory. As an example of the ease with which these one hundred and nineteen counties can be erected into eight congressional districts, composed of contiguous and compact territory and with substantially equal population, the court during the argument called upon counsel for the plaintiff to file a map showing if and how this could be done. Such map was prepared and filed as an exhibit in the case. This map shows that these counties could have been laid off into eight congressional districts with no greater difference in population between them than approximately 4,000 people, and this without doing violence to the requirement that the districts must be composed of compact and contiguous territory. Of course, I do not mean to intimate that the legislative act should be declared void because it is not in substantial compliance with the tentative districting shown by the map referred to. I simply mean to hold that this tentative districting of the state, as disclosed by the map referred to, clearly shows no real difficulty confronted the Legislature in substantially complying with the federal law.

Instead of doing so, however, the Legislature, without any reason whatever so far as I can discover other than the exigencies of practical politics, in redistricting the state worked out a gross inequality in population between the respective districts. To the First district, beginning at the Mississippi river and extending eastwardly between the Ohio river on the north and the Tennessee line on the south, were allotted counties containing a population of 238,189. The Second district, which is the very next district to the east from the First district and which extends from the Ohio river to the Tennessee line, was given a population of 338,117, or substantially 100,000 more population than was assigned to the First district, and substantially 100,000 more population than the

Fourth district, which is the district to the east of and adjoining the Second. To the east of the Fourth is the Sixth, containing a population of 317,591, or approximately 80,000 more than either the Fourth or the First. To the south of the Fourth and the Sixth lies the new Ninth with a population of 352,869, or approximately 114,000 more than the population of either the First or the Fourth, and with a population of approximately 107,000 in excess of the new Seventh which adjoins the Ninth on the north and east and has a population of 245,598. The Ninth has a population of approximately 65,000 in excess of the new Eighth, which lies along the eastern boundary line of the state and between the Ohio river and the Seventh, and more than 112,000 in excess of the new Fifth district, which lies along the Ohio river and north of the central part of the state. The discrimination in population against the Second and the Sixth districts, and in favor of the Fifth, Seventh, and Eighth, is only slightly less than glaring. In view of the ease with which these discriminations could have been avoided, we are forced to the conclusion that no attempt was made to avoid them, but that other considerations than the securing of equality of population dictated the laying out of these districts.

Not only did the Legislature disregard the requirement of substantial equality of population, but the new Fifth district, especially, outrageously violates the requirement of compactness of territory. Its shape very much resembles a French style telephone, with the counties of Oldham, Trimble, Carroll, Gallatin, Boone, Kenton, and Campbell strung along the river forming the handle of the telephone, and the county of Shelby on one end and the counties of Grant and Pendleton on the other end forming the mouthpiece and receiver respectively. Henry and Oldham and the northern parts of Franklin and Scott counties project, appendix-like, between the eastern and western ends of the district. In any good-faith attempt to make the Fifth district a compact one, as required by the federal statute, Owen and Henry counties, with a population of 10,710 and 12,564, respectively, certainly would have been included. Irrespective of the inequality of population between the districts, a visual examination of the outlines upon the map of the new Fifth district is sufficient to repel any presumption of a good-faith attempt on the part of the Legislature to comply with section 3 of the Act of August 8, 1911.

The redistricting act in its entirety must,

therefore, be declared invalid. As heretofore stated, an order conforming to the views herein expressed has already been entered.